# United States Court of Appeals
## For the First Circuit

No. 07-2107

DUDLEY THOMPSON,

Plaintiff, Appellant,

v.

THE COCA-COLA COMPANY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Torruella, Lynch, and Lipez,
Circuit Judges.

Michael O. Shea, with whom Law Office of Michael O. Shea,
P.C., was on brief for appellant.
Damon P. Hart, with whom Holland & Knight LLP, was on brief
for appellee.

April 15, 2008

**TORRUELLA, <u>Circuit Judge</u>.** Upon returning from vacation in Jamaica, Dudley Thompson was terminated by The Coca-Cola Company ("Coca-Cola") for failure to follow office procedure including not finding someone to cover his shifts while he was away. Thompson alleges that he suffered discrimination based on his race and national origin in addition to retaliation for engaging in protected conduct. The district court granted summary judgment for Coca-Cola. Thompson appeals. After careful consideration, we affirm.

## I. <u>Background</u>

We recite the facts from the record in the light most favorable to the nonmovant, Thompson. <u>See</u> <u>Franceschi</u> v. <u>U.S. Dep't of Veteran Affairs</u>, 514 F.3d 81, 83 (1st Cir. 2008).

Thompson, an African-American of Jamaican origin, started working for Coca-Cola in 2000 as one of four production supervisors in the quality assurance department at Coca-Cola's Northampton plant.[1] Gerald Goodsell, who Thompson alleges made discriminatory comments, oversaw the production supervisors and served as an interim production manager from August 2003 until December 2003, when Dennis Williams transferred from another plant to take over duties as production manager at the Northampton plant.

---

[1] Marin Duval, Diego García, and Sean Rutherford, who are white, Latino, and African-American, respectively, were the other three production supervisors at the time Thompson was terminated.

-2-

Throughout most of Thompson's tenure at Coca-Cola, he performed well. On a few occasions, however, he was reprimanded for being late to work. Production managers also gave Thompson frequent informal "coaching sessions" aimed at helping him improve his performance.

According to Thompson, in late 2002 or early 2003, Goodsell expressed irritation at an African-American disc jockey's selection of reggae music at the annual Christmas party. Thompson alleges that Goodsell said, "I hate Jamaican music and Jamaicans." Thompson asserts he did not report the comment because he feared retaliation and termination. Thompson also alleges that on another occasion, in or about August or September 2003, Goodsell said to him, "I'll deal with you, you fucking Jamaican." Thompson claims that Goodsell told him more than once that he was going to "deal with him" and that Goodsell made other threatening and harassing comments. Thompson does not provide any specifics, nor does he allege that any of these other comments were racial or discriminatory in nature.

In April 2002, Donna Harris, a white female quality assurance supervisor who was not in Thompson's chain of command, said to Ronald McKeithen (Thompson's co-worker who is also of Jamaican origin), "I'm not one of [Thompson's] Jamaican bimbos." Thompson and McKeithen reported the incident to John Newton, the quality assurance manager. Newton informed Celine Lasonde, the

human resources manager, and Lasonde instructed Newton to sit down with Harris and discuss her inappropriate comments. Harris was instructed to apologize to McKeithen (which she did), and she was also required to undergo sensitivity training. Thompson claims that after this incident and Harris's reprimand, she retaliated against him by using her position to negatively impact his work.[2]

On August 29, 2003, in response to coverage problems caused by shift-swapping, the plant manager, James Lane, sent an e-mail to all of the production supervisors outlining procedures for vacation time. Supervisors were instructed that they should "(1) obtain coverage from another production supervisor; (2) request personal vacation time from the direct manager in writing; (3) notify the other production supervisors; and (4) enter the requested vacation time into a computerized spreadsheet." Though it was protocol to give advance notice, Coca-Cola acknowledges that there was no advance-notice requirement and no formal policy implemented with respect to vacation time.

In the fall of 2003, Thompson realized that he needed dental surgery, and he decided to have the surgery performed in Jamaica because the procedure would cost less. By December, he needed urgent dental attention, and he claims that he informed the

---

[2] Thompson and Harris seem to have had a contentious relationship for some time. In 2002, Thompson complained to management that Harris had taken unapproved leave. In fact, she had requested and received approved leave under the Family and Medical Leave Act, 29 U.S.C. §§ 2601 et seq.

management that he needed to travel to Jamaica to have dental work done immediately. Thompson asserts that he spoke to Héctor Lepage, his "leader",[3] about the dental surgery in early December 2003 and then told one of the other supervisors, Duval, about his proposed time off. Thompson claims that Duval agreed to cover his shifts. Thompson also claims that he told Duval that he might need extra time off, but he could not be sure until he was in Jamaica and had an opportunity to see his dentist. Thompson says that Duval approved and asked him to send him an e-mail confirming the details. Thompson sent Duval the confirmatory e-mail at 10:27 p.m. on December 18, 2003. Duval did not read the e-mail from Thompson until the next time he reported to work, which was on December 21, 2003. Duval claims he did not know the exact dates Thompson would be away, including the possibility of the extra week off, until he read the e-mail.

Thompson asserts that after he arranged coverage with Duval, he spoke to Dennis Williams, who gave him approval, so long as Goodsell was informed as well. Thompson called Goodsell at his home on December 19, 2003, at around 7 p.m., the evening before his early-morning flight to Jamaica. Goodsell did not tell Thompson that he could not take time off; Goodsell's only concern was coverage for Thompson's shifts. Thompson entered his time off on

---

[3]  Though Thompson refers to Lepage as his "leader," the record reflects that Lepage was actually Thompson's subordinate.

the spreadsheet through the end of December. He did not request time off in writing. As a result of Thompson's leave, Goodsell had to fill in as production supervisor at some point, and Duval had to work over forty consecutive days.

Once he was in Jamaica, Thompson realized that he would not be back until January 9, 2004, because his surgery would take longer than he initially expected. Thompson called Coca-Cola to inform management that he would need extra time; he left a message on Goodsell's voice-mail. Goodsell did not respond to Thompson's message. Thompson assumed that his extension had been approved by Goodsell. Goodsell, however, reported to Lasonde and Lane that Thompson failed to comply with vacation protocol. Lasonde interviewed Rutherford, García, Duval, and Goodsell to discuss Thompson's leave. After Thompson returned from Jamaica, he was given an opportunity to discuss the situation in a meeting with Goodsell, Lane, Lasonde, and Williams.

At the meeting, Thompson contested Coca-Cola's version of the events surrounding his vacation. He did not make any claims at the time that Goodsell had been racially biased against him. Shortly after that meeting, Lasonde, Williams, and Lane sent a "Separation Proposal" to the Coca-Cola Separation Review Committee in Atlanta, Georgia. The Separation Review Committee agreed with the Separation Proposal and terminated Thompson. Thompson claims that it is clear that Goodsell was an integral part of his

termination and that he was retaliated against because of his race and national origin. According to Coca-Cola, Thompson was terminated solely for taking unauthorized vacation time without giving prior proper notice.

Thompson filed a claim with the Massachusetts Commission Against Discrimination on April 30, 2004, arguing that he had been discriminated against, harassed, and retaliated against based upon his race, ethnicity, color, national origin, and ancestry under chapter 151B of the General Laws of Massachusetts. Thompson withdrew his complaint with the Commission on August 20, 2004, and filed suit in Hampshire County Superior Court on May 23, 2005. Coca-Cola removed the case to federal court on July 19, 2005. Coca-Cola then filed a motion for summary judgment on August 31, 2006. The district court granted the motion on July 16, 2007. Thompson appealed.

## II. **Discussion**

### A. **Standard of Review**

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law based on the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits. See Fed. R. Civ. P. 56(c); Cox v. Hainey, 391 F.3d 25, 29 (1st Cir. 2004). When considering arguments for summary judgment, "we must disregard improbable or overly attenuated inferences, unsupported

conclusions, and rank speculation." Abbott v. Bragdon, 107 F.3d 934, 938 (1st Cir. 1997), vacated on other grounds, 524 U.S. 624 (1998). To defeat a motion for summary judgment, the evidence offered by the adverse party cannot be "merely colorable" or speculative. Pegano v. Frank, 983 F.2d 343, 347 (1st Cir. 1993) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)) (internal quotation marks omitted). The evidence "must be significantly probative of specific facts." Pérez v. Volvo Car Corp., 247 F.3d 303, 317 (1st Cir. 2001) (citing Anderson, 477 U.S. at 249). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996) (citation and internal quotation marks omitted). "A fact is material if it has the potential of determining the outcome of the litigation." Maymí v. P.R. Ports Auth., 515 F.3d 20, 25 (1st Cir. 2008). We review a district court's grant of summary judgment de novo. See Hegarty v. Somerset County, 53 F.3d 1367, 1372 (1st Cir. 1995). We will reverse only if, "after reviewing the facts and making all inferences in favor of the non-moving party [here, Thompson], the evidence on record is sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." Maymí, 515 F.3d at 25 (internal quotation marks and citations omitted).

**B.  Analysis**

First, Thompson argues that he has provided sufficient evidence that he was terminated based on his race and national origin.  Even if Goodsell was not officially responsible for the decision to terminate, Thompson argues that Goodsell had enormous influence in the process.  Thompson argues that the causal connection between the decision to terminate him and Goodsell's discriminatory comments is not broken since the Separation Review Committee acted on biased information without conducting its own independent investigation.  See Cariglia v. Hertz Equipment Rental Corp., 363 F.3d 77, 84-85 (1st Cir. 2004).

Second, Thompson asserts that he was exposed to a hostile work environment through Goodsell's comments, Harris's comments, and Goodsell's failure to follow Coca-Cola's policies and procedures.  He contends that the district court erred when it characterized Goodsell's alleged comments as stray, and, therefore, insufficient to prove claims of a hostile work environment or discriminatory termination.  Thompson maintains that he suffered retaliation because he engaged in protected conduct and was given poor performance evaluations upon which his termination was ostensibly based.

We do not find support for Thompson's arguments and reject them in turn.

## 1. Race and National Origin Discrimination

To make out a prima facie case of discrimination under Mass. Gen. Laws ch. 151B, § 4(1),[4] Thompson must prove that he "is a member of a protected class, [that he] suffered harm as a result of [Coca-Cola's] adverse employment action, and [that Coca-Cola] harbored discriminatory animus, which was the determinative cause of the adverse action."  Weber v. Cmty. Teamwork, Inc., 752 N.E.2d 700, 711 (Mass. 2001); Lewis v. City of Boston, 321 F.3d 207, 213-14 (1st Cir. 2003) (construing Massachusetts law).  Thompson bears the burden of proving discrimination.  See Blare v. Husky Injection Molding Sys. Boston, Inc., 646 N.E.2d 111, 117 (Mass. 1995).

Under the McDonnell Douglas burden-shifting analysis, we employ a familiar three-stage framework in evaluating claims for discrimination.   See  Wheelock Coll.  v.  Mass.  Comm'n Against Discrimination, 355 N.E.2d 309, 314 (Mass. 1976).  Thompson bears the  initial  burden  of  establishing  a  prima  facie  case  of discrimination.  McDonnell Douglas Corp. v. Green, 411 U.S. 792,

---

[4]  The statute reads in relevant part:

> It shall be an unlawful practice: 1. For an employer, by himself  or  his  agent,  because  of  the  race,  color, religious  creed,  national  origin,  sex,  sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, genetic  information,  or  ancestry  of  any  individual  to refuse to hire or employ or to bar or to discharge from employment such individual  or  to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification.

-10-

802 (1973). The burden then shifts to Coca-Cola "to present a legitimate, non-discriminatory reason, sufficient to raise a genuine issue of material fact as to whether it discriminated against [Thompson], for the employment decision." Quiñones v. Buick, 436 F.3d 284, 289 (1st Cir. 2006). "[Coca-Cola's] obligation is one of production as opposed to persuasion, as the burden of persuasion remains with [Thompson]." Lewis, 321 F.3d at 214. If Coca-Cola meets its burden and provides a non-discriminatory justification for Thompson's termination, the "presumption of discrimination disappears," and the burden shifts back to Thompson, who must demonstrate that Coca-Cola's decision was merely a pretext "to hide such discrimination." Id.

We must first determine whether Thompson makes out a prima facie claim for race discrimination. It is undisputed that Thompson is a member of a protected class because he is an African-American. His termination was an adverse employment action. Taking the facts in the light most favorable to Thompson, he makes a claim that he was terminated for discriminatory reasons because he is of Jamaican origin and Goodsell made numerous discriminatory comments about Jamaicans and threatened to "deal with him." He has met his burden for the first prong of the test. The burden now shifts to Coca-Cola to present a non-discriminatory reason for terminating him.

The record reflects that Coca-Cola's decision to terminate Thompson was based on Thompson's failure to follow office procedure with regard to vacation leave. Thompson did not put his vacation request in writing, and he did not secure the appropriate coverage for the days that he would be away. The record reflects that Duval told Lasonde that Thompson had not secured coverage for his shifts in advance. Duval maintains that he did not have confirmation of the dates Thompson was going to be away until December 23, 2003; he received an e-mail the night before Thompson departed for Jamaica. Thompson acknowledges that his first contact with his direct supervisor, Goodsell, about his leave was only hours before he departed for Jamaica. He admits that he failed to follow any of the required steps of the protocol for his one-week extension of the vacation because he merely relied on a unilateral voice-mail to Goodsell. He also did not enter the vacation period into the company's computerized vacation spreadsheet. These facts are supported by evidence, including Thompson's own admissions. Furthermore, Thompson acknowledged that violation of procedures would constitute a legitimate, non-discriminatory reason for his termination. Coca-Cola thus met its burden of producing a legitimate, non-discriminatory reason for terminating Thompson.

Since Coca-Cola has shown a legitimate, non-discriminatory reason for terminating Thompson, the burden shifts back to Thompson. Thompson "can no longer rest on the initial

-12-

inference of discrimination but, rather, must show that [Coca-Cola's] articulated reason is pretextual." Bennett v. Saint-Gobian Corp., 507 F.3d 23, 31 (1st Cir. 2007). "To meet this burden, [Thompson] must prove not only that the reason articulated by the employer was a sham, but also that its true reason was plaintiff's race or national origin." Rodríguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 19 (1st Cir. 1999).

Under settled discrimination law, to demonstrate that its stated reasons for terminating Thompson were not pretextual, Coca-Cola's explanation need not be perfect. See Mesnick v. Gen. Elec. Co., 950 F.2d 816, 825 (1st Cir. 1991) ("Courts may not sit as super personnel departments, assessing the merits -- or even rationality -- of employers' nondiscriminatory business decisions."). Coca-Cola's reasons for terminating Thompson must simply be legitimate and not a cover-up for discrimination. See Loeb v. Textron, Inc., 600 F.2d 1003, 1012 n.6 (1st Cir. 1979) ("While an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was a pretext for illegal discrimination. . . . [The] focus is to be on the employer's motivation, . . . not on its business judgment."); T&S Serv. Assoc., Inc. v. Crenson, 666 F.2d 722, 727 (1st Cir. 1981). If there is no proof of discriminatory animus on the part of a decisionmaker, a plaintiff must show more than that the decisionmaker's perception was incorrect; he must

-13-

show that the "decisionmaker did not believe in the accuracy" of the information that he was given.  Bennett, 507 F.3d at 31.  Put another way, "[t]he question is not whether [Thompson's] or his fellow employees' version is the true one, but whether [the decisionmakers] believed what [they] had been told by those [who were] interviewed" by management.  Ronda-Pérez v. Banco Bilbao Vizcaya Argentaria, 404 F.3d 42, 45 (1st Cir. 2005).

Coca-Cola posits that the only real issue for the court to decide is whether the Separation Review Committee acted with discriminatory animus.  We agree.

Thompson makes no allegation that the Separation Review Committee had any bias of its own against Thompson.  "Actionable discrimination cannot exist in a vacuum.  Rather the discriminatory intent of which a plaintiff complains must be traceable to the person or persons who made the decision to fire him."  Bennett, 507 F.3d at 31.  Thompson cannot meet this burden.  His allegations of stray remarks made by Harris and Goodsell are insufficient to prove that the Separation Review Committee was somehow biased against him.

Harris was a non-decisionmaker, and a comment such as hers "cannot support an inference of pretext because it was one stray remark, and was made by a non-decision maker."  Velázquez-Fernández v. NCE Foods, Inc., 476 F.3d 6, 11 (1st Cir. 2007) (citing González v. El Día, Inc., 304 F.3d 63, 69 (1st Cir. 2002)).

-14-

Harris had no role in Thompson's termination, and her comment is immaterial. First, the comment was not made to Thompson. Second, management at the plant responded immediately, reprimanded her, and required her to apologize. Third, Harris did not supervise Thompson and was not in a position to affect his work. See Douglas v. J.C. Penney Co., 474 F.3d 10, 15 (1st Cir. 2007) ("[plaintiff] identifies at most one possibly racially-tinged comment by a co-worker who was not [plaintiff's] supervisor and as such is irrelevant"). Remarks by non-decisionmakers are not probative of context. See Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 10 (1st Cir. 1990) ("the biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case").

Goodsell's alleged comments, two of three of which preceded Thompson's termination by over a year and none of which involved the termination process, can be characterized as nothing other than stray. This circuit has held that "'stray workplace remarks' . . . normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus." El Día, Inc., 304 F.3d at 69; see also Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 36 (1st Cir. 2001). Goodsell's input was minimal and consistent with Thompson's own account of the events. "Despite a retaliatory or discriminatory motive on the part of a supervisor who recommends that some adverse action be taken against

-15-

an employee, a third person's independent decision to take adverse action breaks the causal connection between the supervisor's retaliatory or discriminatory animus and the adverse action." Mole v. Univ. of Mass., 814 N.E.2d 329, 343 (Mass. 2004). The record reflects that Goodsell's input was limited and that the Separation Review Committee made its own independent decision to terminate Thompson based on the facts of the situation. In Mole, the Massachusetts Supreme Judicial Court said that "[w]hen assessing the independence of the ultimate decision maker, courts place considerable emphasis on the decision makers giving the employee the opportunity to address the allegations in question." Id. at 344. Coca-Cola gave Thompson such an opportunity, and he failed to adequately explain his actions or even give a substantially different account of events. Instead, he acknowledged that he did not follow proper procedures.

Contrary to arguments made by Thompson, Cariglia is inapposite. Among other reasons, in Cariglia, the defendant's decision to terminate the plaintiff was based upon a report drafted by a discriminatory supervisor, and the defendant did not conduct any further investigation or ask the employee for his version of events. Cariglia, 363 F.3d at 81-82. In examining those facts we noted that "the critical legal issue [is] whether corporate liability can attach when neutral decisionmakers rely on information that is manipulated by another employee who harbors

-16-

illegitimate animus."  Id. at 86.  We remanded the case to the district court to address whether information was withheld from the neutral decisionmakers, but we noted that our decision may have been different if Cariglia had been given a meaningful opportunity to address the reasons for his termination.  See id. at 87 n.4.

Thompson argues that there was no meaningful investigation into what happened, and that the Separation Review Committee based its decision on a biased account by Goodsell.  The record demonstrates that this is patently false.  Lasonde convened a meeting with everyone involved while Thompson was still in Jamaica to gather information about what transpired.  She also met with Thompson, Goodsell, Lane, and Williams immediately after Thompson returned from his trip and gave him an opportunity to explain himself.  He did not contradict Goodsell's version of events, except to say that he had coverage, that he was not really required to submit his request in writing (even though he admitted to receiving a previous e-mail from management outlining that leave requests must be submitted in writing), and that he asked Duval to cover his shifts.  But "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson, 477 U.S. at 247-48.  Thompson did not make any allegations against Goodsell at the time.  Thompson presents no evidence that Goodsell made the

decision to terminate him, nor can he point to any information in Lasonde's Separation Proposal Memorandum provided by Goodsell without corroboration by Thompson himself or other employees. This is not a situation where Goodsell "conceal[ed] relevant information from the decisionmak[ers] . . . or [fed] false information to [them], [and was] able to influence the decision." Cariglia, 363 F.3d at 87 (quoting Wallace v. SMC Pneumatics, 103 F.3d 1394, 1400 (7th Cir. 1997)) (internal quotation marks omitted).

Lasonde's recommendation to the Separation Review Committee was based on record evidence, an investigation of the situation, and reflected her belief that Thompson should be terminated for taking unauthorized vacation. Thompson has not shown that his termination was in any way a result of racial or national origin discrimination. His claims fail.

### 2. Harassment and Retaliation

In looking at a claim for hostile work environment, we assess whether a plaintiff "was subjected to severe or pervasive harassment that materially altered the conditions of [his] employment." Noviello v. City of Boston, 398 F.3d 76, 92 (1st Cir. 2005) (citing Faragher v. City of Boca Ratón, 524 U.S. 775, 786 (1998)). To sustain a claim of hostile work environment, Thompson must demonstrate that "the harassment was sufficiently severe or pervasive so as to alter the conditions of [his] employment and create an abusive work environment" and that the "[racially]

-18-

objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and [that Thompson] in fact did perceive it to be so." Douglas, 474 F.3d at 15 (citation omitted).

Thompson argues that he was exposed to a hostile work environment through Goodsell's comments, Harris's comments, and Goodsell's failure to follow Coca-Cola's policies and procedures. Thompson contends that Coca-Cola failed to "exercise[] reasonable care to prevent and correct [the harassment] promptly," and failed to show that Thompson "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Noviello, 398 F.3d at 94-95 (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998)). We do not agree.

Under Massachusetts law, a hostile work environment is one that is "'pervaded by harassment or abuse, with the resulting intimidation, humiliation, and stigmatization, [and that] poses a formidable barrier to the full participation of an individual in the workplace.'" Cuddyer v. Stop & Shop Supermarket Co., 750 N.E.2d 928, 937 (Mass. 2001) (quoting College-Town, Div. of Interco, Inc. v. Mass. Comm'n Against Discrimination, 508 N.E.2d 587, 591 (Mass. 1987)). The environment must be sufficiently hostile or abusive in light of all of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether

-19-

it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Faragher</u>, 524 U.S. at 787-88 (quoting <u>Harris</u> v. <u>Forklift Sys., Inc.</u>, 510 U.S. 17, 23 (1993)).

Thompson points to only three instances that could possibly constitute harassment that could create a hostile work environment in the span of four years, and they were spread out over that time. Harris's comment cannot be considered pervasive on its face because she made the comment only on one occasion. Moreover, Coca-Cola disciplined her and required her to take part in sensitivity training. The comment was not directed at Thompson, and by his own admission, he did not find it severely derogatory towards him. Harris was not in Thompson's department and she had no management responsibility towards him. <u>See</u> <u>Fontánez-Núñez</u> v. <u>Janssen Ortho LLC</u>, 447 F.3d 50, 57 (1st Cir. 2006).

Taking as true that Goodsell made derogatory comments to Thompson, the first alleged comment was made once during a social event, not in connection with any work situation or any other objectionable statements or conduct. More is needed to constitute a hostile work environment. <u>See</u> <u>Kosereis</u> v. <u>Rhode Island</u>, 331 F.3d 207, 216 (1st Cir. 2003) ("A hostile work environment generally is not created by a 'mere offensive utterance,' nor does it arise from 'simple teasing, offhand comments, and isolated incidents.'"

-20-

(internal citations omitted)).  Goodsell's alleged comments did not rise to the level of severely hostile or abusive actions.

The second alleged comment by Goodsell occurred months after the first alleged comment and months before Thompson's vacation and subsequent termination in 2004.  Even so, under Speen v. Crown Clothing Corp., 102 F.3d 625 (1st Cir. 1996), "ambiguous remarks, tending to suggest animus . . . are insufficient, standing alone, to prove an employer's discriminatory intent."  Id. at 636 (quoting Blare, 646 N.E.2d at 118 n.9).  Thompson never reported any of the alleged comments that Goodsell made to anybody.  As noted by the district court, Coca-Cola has "a comprehensive anti-discrimination and workplace dispute resolution system, which provides employees with several avenues for reporting incidents.  These avenues include a toll-free phone number to report issues of concern, as well as the opportunity for a confidential consultation with an ombudsman."  Thompson v. Coca-Cola Co., 497 F. Supp. 2d. 80, 84 (D. Mass. 2007).  Thompson concedes that he never made or attempted to report any alleged incidents until after he was terminated.  See Fontánez-Núñez, 447 F.3d at 57 ("[T]he undisputed facts establish that [defendant] had well established antiharassment and antidiscrimination policies that included procedures for employees to follow in airing grievances and that [plaintiff] failed to take advantage of these procedures.").  Thompson's co-workers, who are of various races, acknowledge that

Goodsell yelled at them at times, but they categorically deny that he ever made racially charged or racially insensitive statements. There is no evidence that Coca-Cola engaged in any type of harassment of Thompson.

Thompson asserts that he suffered retaliation because he engaged in protected conduct, and he was given poor performance evaluations upon which his termination was ostensibly based. To establish a prima facie case of retaliation, an employee must show that (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) a causal link existed between the protected activity and the adverse job action. See Noviello, 398 F.3d at 88. For a retaliation claim to "'survive a motion for summary judgment, the plaintiff must point to evidence in the record that would permit a rational factfinder to conclude that the employment action was retaliatory.'" Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 57 (1st Cir. 2000) (quoting King v. Town of Hanover, 116 F.3d 965, 968 (1st Cir. 1997)).

In Mole, the Massachusetts Supreme Judicial Court held that in a retaliation claim the inference of causation arises only "where adverse employment actions follow close on the heels of protected activity." Mole, 814 N.E.2d at 341. If there is an inference of causation, it has a limited lifespan, and "as the elapsed time between these two event becomes greater, the inference weakens and eventually collapses." Id. The only protected

activity that Thompson could be considered to have engaged in was complaining about Harris's comments, which occurred in the Spring of 2002. Thompson did not make any other complaints, confidential or otherwise, until after he was terminated. On the other hand, once Harris's comment was brought to Coca-Cola's attention, Lasonde took immediate, corrective action. As stated above, Harris had no connection to, and no role in, Thompson's termination two years later. Any allegation that Harris's comments affected his performance evaluations is unsupported by the record. Additionally, four of the six written corrective memoranda addressing Thompson's poor performance were written before Harris's comment. The two memos that were written after Harris's comment were written by a supervisor against whom Thompson makes no claim, and the memos were written to assist Thompson in improving his performance. The memos in no way support his claim of retaliation. Assuming the evaluations could be considered adverse employment actions, Thompson has failed to demonstrate any causal link between those evaluations and his complaint against Harris.

### III. <u>Conclusion</u>

For these reasons, we affirm the district court's grant of summary judgment.

**<u>Affirmed</u>**.