**Kathy HENRY, Plaintiff**

v.

**UNITED BANK, Defendant.**

**Civil Action No. 10–30062–KPN.**

United States District Court,
D. Massachusetts.

May 9, 2011.

---

Emily J. Daniell, Michael O. Shea, Law Office of Michael O. Shea, P.C., Wilbraham, MA, for Plaintiff.

Marylou Fabbo, Timothy F. Murphy, Skoler, Abbott, & Presser, P.C., Springfield, MA, for Defendant.

*MEMORANDUM AND ORDER WITH REGARD TO DEFENDANT'S MOTIONS TO STRIKE AND FOR SUMMARY JUDGMENT (Document Nos. 18 and 27)*

NEIMAN, United States Magistrate Judge.

Kathy Henry ("Plaintiff") brings this action against United Bank ("Defendant"), alleging discrimination and retaliation based on her medical disability in violation of Mass. Gen. L. ch. 151B ("chapter 151B") and the Family and Medical Leave Act

("FMLA"), 29 U.S.C.S. §§ 2601–2654 (2006). Defendant, in response, alleges that it acted appropriately when it terminated Plaintiff's employment.

The parties have jointly consented to the jurisdiction of this court pursuant to 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73, and Defendant has moved to strike certain factual statements from Plaintiff's statement of facts and for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons that follow, Defendant's motion to strike will be granted, in part only, and its motion for summary judgment will be allowed in full.

## I. STANDARD OF REVIEW

When ruling on a motion for summary judgment, the court must construe the facts in a light most favorable to the non-moving party. *Benoit v. Tech. Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir.2003). Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" when the evidence is such that a reasonable factfinder could resolve the point in favor of the non-moving party, and a fact is "material" when it might affect the outcome of the suit under the applicable law. *Morris v. Gov't Dev. Bank*, 27 F.3d 746, 748 (1st Cir.1994). The non-moving party bears the burden of placing at least one material fact into dispute after the moving party shows the absence of any disputed material fact. *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir.1994) (discussing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

## II. BACKGROUND

### A. *Facts Not in Dispute*

The parties do not dispute the following facts which are construed in a light most favorable to Plaintiff. To reduce its risk of regulatory non-compliance, Defendant retains Chaston and Associates ("Chaston"), an independent loan review company, to audit its credit functions twice a year. (Defendant's Statement of Facts ("Def. SOF") ¶ 61.) In 2007, Chaston advised Defendant to expand its commercial credit analysts staffing levels from two positions to three. (Plaintiff's Statement of Facts ("Pl. SOF") ¶ 63.) Following this advice, in June of 2007, Defendant hired Plaintiff as its third credit analyst. (Def. SOF ¶¶ 2, 63.) In this capacity, Plaintiff made credit recommendations as to whether Defendant should be lending to or continuing to lend to certain borrowers. (*Id.* ¶ 7.) In making such recommendations, Plaintiff evaluated the credit of potential borrowers, reviewed borrowers' financial information, and conducted in-depth analyses of borrowers' businesses and personal finances. (*Id.* ¶ 8.) Plaintiff also performed "loan reviews," *i.e.*, evaluations of the continued credit worthiness of existing borrowers. (*Id.* ¶ 9.) Plaintiff reported to Joanne Sheedy ("Sheedy"), Assistant Vice President of Credit, who in turn reported to Jack Patterson ("Patterson"), Vice–President of Risk Management. (*Id.* ¶ 4.)

In early 2008, Plaintiff began experiencing neck pain, shoulder pain, blurred vision, and dizziness and, prior to July, requested and received various accommodations as a result of these symptoms. (*Id.* ¶¶ 12–19.) By July 1, 2008, Plaintiff's symptoms had severely worsened and her primary care physician notified Defendant that she would be on "bed rest until further notice." (*Id.* ¶ 24). Over the course of the next month or so, Defendant received correspondence from Plaintiff's physician recommending that her leave of absence be extended, stating that she was "unsure" when Plaintiff could return to work, and indicating that a return to work date was "indeterminable." (*Id.* ¶¶ 34, 38.) Plaintiff now asserts that she was unable to work in any capacity from

July 1, 2008 through April 4, 2009. (*Id.* ¶ 23.)

In any event, in late July 2008, although Plaintiff had not yet completed all of the necessary forms, Defendant informed her that her FMLA leave was deemed to have begun on July 1, that she had used three weeks of leave, and that she had nine weeks remaining. (*Id.* ¶ 31.) On July 25, 2008, Plaintiff completed her paperwork for FMLA leave and short-term disability leave.[1] (*Id.* ¶ 36.) On September 8, 2008, Plaintiff was notified by Lincoln Financial that her request for short-term disability leave had been denied because there was a lack of evidence that she suffered from an impairment that would prevent her from performing her role as a credit analyst. (*Id.* ¶ 46.)

In early September 2008, Sheedy, Patterson, and Miriam Siegel ("Siegel"), Senior Vice President of Human Resources, discussed the staffing needs of Plaintiff's department and Defendant's ability to continue to hold Plaintiff's position open for an indefinite period. Hopeful that Plaintiff would be able to return to work, they decided to wait until the end of the month before making any decision. (*Id.* ¶ 45.)

On September 17, 2008, Defendant received a Certification of Health Care Provider ("CHCP") from Plaintiff's physician, which included the following information: (1) Plaintiff was not incapacitated and was "able to perform her job—no heavy lifting"; and (2) Plaintiff was not limited to intermittent work or work on less than a full schedule. (*Id.* ¶ 55.) Plaintiff's primary care physician further indicated that Plaintiff could return to work by placing "N/A" in response to several questions about a need for Plaintiff's continued absence from work. (*Id.*) On or

about September 22, 2008, following discussions between Sheedy, Siegel, and Patterson, Defendant determined that it was unable to hold Plaintiff's position open any longer. (*Id.* ¶ 59.) That same day, Defendant informed Plaintiff that it had received her physician's CHCP, stating that she was not incapacitated and that she was expected to return to work on September 25, 2008. (*Id.* ¶ 71.) She did not.

Thus, as of September 23, 2008, Defendant had held Plaintiff's job open for twelve weeks and had made contributions to her health insurance, dental insurance, and individual disability plan. (*Id.* ¶¶ 71–73.) During Plaintiff's leave of absence, two of her colleagues were required to work additional hours and another colleague was required to manage additional work during her regular workday. (*Id.* ¶ 68.)

On September 25, 2008, Plaintiff was terminated by joint decision of Sheedy, Patterson, and Siegel. (*Id.* ¶¶ 77–78.) That same day, Plaintiff left a note for Siegel from her neurosurgeon stating that she was scheduled to undergo a surgical procedure "in the next few weeks" and that she was "to remain out of work until further notice." (*Id.* ¶ 76.) On April 4, 2009, Plaintiff was cleared to return to work without restrictions. (Pl. SOF ¶ 85.)

B. *Defendant's Motion to Strike*

■ Defendant has moved to strike the following paragraphs from Plaintiff's statement of facts:

1) That Plaintiff was informed by Lincoln Financial that Defendant made the final decision regarding whether to deny

---

[1]. In addition to requesting FMLA leave, Defendant's employees may submit requests for short-term disability benefits to Lincoln Financial. (*Id.* ¶ 27–28.) There is a dispute, however, whether requests for short-term disability benefits are handled exclusively by Lincoln Financial or are subject to final review by Defendant.

her application for short-term disability benefits. (*Id.* ¶¶ 28–29, 46–47.)

2) That the CHCP completed by Plaintiff's primary care physician "mistakenly" and "incorrectly" indicated that Plaintiff could return to work. (*Id.* ¶¶ 57, 71.)

3) That Plaintiff's primary care physician told her she could not return to work until she met with her neurosurgeon. (*Id.* ¶ 71.)

4) That Plaintiff's neurosurgeon informed her some time between October 2008 and early 2009 that "hopefully [he could] get [her] back to work within six months." (*Id.* ¶ 84; Pl. Dep. at 281.)

5. Sheedy's negative comments regarding Plaintiff's colleague while he was out on medical leave. (*Id.* ¶ 20.)

6) Plaintiff's statements regarding her beliefs as to why she was terminated. (*Id.* ¶¶ 71, 80.)

The court will strike the portions of Plaintiff's Statement of Facts as cited in paragraph 2 above, as these statements are based only on speculation and theory. Plaintiff argues that the letter from her neurosurgeon stating that Plaintiff had "been unable to go to work since July 1, 2008" indicates that the CHCP from her primary physician was wrong. Notwithstanding that the letter from Plaintiff's neurosurgeon does not address the information contained in the CHCP, much less characterize it as incorrect, even interpreting Plaintiff's neurosurgeon's letter as disagreeing with the CHCP, a mere disagreement among doctors is insufficient to conclude that the CHCP was "incorrect." Because Plaintiff provides no affidavit from her primary physician and points to no evidence discussing the CHCP, Plaintiff's assertions that the CHCP was "mistaken" and "incorrect" are too speculative and will be stricken. The court also strikes Plaintiff's assertions in paragraph 6 above, as these statements concern only

Plaintiff's beliefs regarding her termination and are irrelevant to a determination of whether Defendant's justification for her termination is pretextual. In all other respects, Defendant's motion to strike will be denied. The court will consider the remaining facts too in a light most favorable to Plaintiff.

### III. DISCUSSION

**A. Chapter 151B Violation, Chapter 151B Retaliation, FMLA Retaliation (Counts I, II, and IV)**

■ Plaintiff alleges that Defendant terminated her because of her medical disability (Count I). She also alleges that she was retaliated against for requesting medical and FMLA leave due to her medical condition (Counts II, and IV). The burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies to each of these claims. *See Thompson v. Coca–Cola Co.*, 522 F.3d 168, 176–77 (1st Cir.2008) (chapter 151B); *Sciacca v. Olympia Hotel Mgmt.*, 2010 WL 4273805, at *2–3, 2010 U.S. Dist. LEXIS 115515, No. 09–11293–RWZ, at *5–6 (D.Mass. Oct. 29, 2010) (citing *Mole v. Univ. of Mass.*, 442 Mass. 582, 814 N.E.2d 329, 338 (Mass.2004)) (chapter 151B retaliation); *Colburn v. Parker Hannifin/Nichols Portland Div.*, 429 F.3d 325, 335 (1st Cir.2005) (FMLA retaliation).

■ Notwithstanding Defendant's argument to the contrary, the court will assume for present purposes that Plaintiff has established a *prima facie* case of retaliation and discrimination. At that point, as the parties are well aware, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for Plaintiff's termination. *See Thompson*, 522 F.3d at 176–77. Meeting that challenge, Defendant asserts that Plaintiff was terminated because: (1) credit analysts hold

critical positions in the company and their workload had increased and was expected to further increase; (2) per the recommendation of Chaston, Defendant was advised to maintain three analysts to comply with government regulations and avoid financial risk; (3) Plaintiff's colleagues were required to take on additional work and, in some cases, work additional hours because of her absence; (4) there were no other credit analysts to transfer from another position to Plaintiff's position during her absence; and (5) a temporary employee could not be hired given the confidential customer information to which someone in Plaintiff's position is exposed and that it would take approximately six months to train such an individual. (*See* Siegel Dep. at 96, 98–99, 100, 101–02.)

Given Defendant's facially non-discriminatory justifications for Plaintiff's termination, the court finds that the presumption of discrimination has been rebutted, and it falls to Plaintiff to demonstrate that the reasons proffered by Defendant are mere pretexts for a discriminatory motive. *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 825 (1st Cir.1991). At this stage, it is insufficient for Plaintiff merely to undermine the veracity of the Defendant's proffered justification. Instead, "[Plaintiff] must muster proof that enables a factfinder rationally to conclude that the stated reason behind the adverse employment decision is not only a sham, but a sham intended to cover up the proscribed type of discrimination." *Laurin v. Providence Hosp.*, 150 F.3d 52, 58 (1st Cir.1998). In other words, Plaintiff must demonstrate not only that Defendant's proffered reason for termination was false but, also, that her termination was motivated by discriminatory animus.

Plaintiff concedes that Defendant was advised by Chaston to maintain three analysts, that her colleagues were required to work extra hours and take on additional work to cover her position, and that her position necessarily involved handling confidential client information. Plaintiff argues, however, that Defendant has failed to establish that it suffered an "undue burden" by her absence. Specifically, Plaintiff argues that her colleagues were only required to "put in *some* additional hours" and "would have been able to cope" and asserts that Defendant could have taken "extra precautions to ensure that any temporary employee treated customer information in a confidential manner." (Pl. Opp. at 10–14 (emphasis by Plaintiff).)

Contrary to the implication of Plaintiff's argument, Defendant is not required to establish an undue burden to justify an employee's termination. Rather, it is Plaintiff who bears the burden of establishing that Defendant's articulated rationale for her termination is false. *See McDonnell Douglas Corp.*, 411 U.S. at 802–804, 93 S.Ct. 1817. More to the point, Plaintiff's assertions, speculative as they are, present no evidence that Defendant did not actually believe the workload would increase. *See Thompson*, 522 F.3d at 177 (quoting *Bennett v. Saint-Gobain Corp.*, 507 F.3d 23, 31 (1st Cir.2007)) ("[A] plaintiff must show more than that the decisionmaker's perception was incorrect; he must show that the "decisionmaker did not believe in the accuracy" of the information that he was given."). And even if Plaintiff disagrees with Defendant's business decision, she has not demonstrated for summary judgment purposes that it was disingenuous. *See id.* (relying on "settled discrimination law," that to "demonstrate that its stated reasons for terminating [an employee] were not pretextual, [a defendant's] explanation need not be perfect ... [it's] reasons ... must simply be legitimate and not a cover-up for discrimination."). If anything, Plaintiff's argument—concerning the burden an employer must endure before terminating an

employee—requires the very kind of second-guessing of Defendant's business judgment that the First Circuit has cautioned against. *See Mesnick*, 950 F.2d at 825 (advising that "[c]ourts may not sit as super personnel departments, assessing the merits—or even the rationality—of employers' nondiscriminatory business decisions."); *see also Connell v. Bank of Boston*, 924 F.2d 1169, 1172 (1st Cir.1991) ("We do not second-guess the business decisions of an employer.").

■ Moreover, Plaintiff has not adduced sufficient evidence of discriminatory animus on Defendant's part. To establish discriminatory intent, Plaintiff simply relies on two comments allegedly made by Sheedy, one of the decision-makers involved in her termination. First, Plaintiff asserts that Sheedy described a colleague, who was out on medical leave, as a "wuss" and said that he "needed to get a backbone." Second, Plaintiff asserts that, when she called to inform Siegel that she could not return to work, she heard Sheedy in the background say, "Kathy. What did I do to you? Did I do something to you?"

These statements, the court finds, are insufficient for Plaintiff to meet her burden. First, it is by no means clear that either statement is discriminatory. Sheedy's statement at the time of the telephone call could reasonably be interpreted as one of concern rather than hostility to Plaintiff, especially considering Plaintiff did not testify to any perceived malice on Sheedy's part. (*See* Pl. Dep. at 192–94.) Similarly, it is unreasonable to consider Sheedy's comment regarding Plaintiff's co-worker in a discriminatory light. Plaintiff herself recalled that Sheedy referred to the co-worker as a "wuss" because his wife "was calling in and nobody had followed up to let [Sheedy] know what was going on." As the First Circuit has explained, "a statement that plausibly can be interpret-

ed two different ways—one discriminatory and the other benign—does not directly reflect illegal animus." *Webber v. Int'l Paper Co.*, 417 F.3d 229, 240 (1st Cir.2005) (citing *Fernandes v. Costa Bros. Masonry, Inc.*, 199 F.3d 572, 583 (1st Cir.1999)).

■ Even assuming Sheedy's comments were somehow discriminatory, they in no way establish that Plaintiff's termination was based on her disability. First, one comment concerned Plaintiff's colleague, not her. Second, Sheedy was only one of three individuals involved in the decision to terminate Plaintiff, and Plaintiff attributes no discriminatory animus to Siegel or Patterson. Third, as Plaintiff acknowledges, Defendant made several accommodations to her in the past based on her medical problems, including: (1) allowing her to go to physical therapy during the day, despite it sometimes resulting in Plaintiff taking a later lunch; (2) providing her with a keyboard and monitor lift, an ergonomic chair, and modifications to the air conditioning; and (3) allowing her to get up and walk around as needed to loosen her body. Finally, Plaintiff's argument that Defendant terminated her because of her request for a medical accommodation is undermined by the fact that Defendant did not terminate her colleague on medical leave and he returned to work under Sheedy's supervision.

Persevering, Plaintiff also argues that Defendant's failure to reconsider her termination upon discovering that the CHCP was completed "incorrectly" by her primary care physician evidences Defendant's discriminatory intent. (Pl. Opp. at 13–14.) More specifically, Plaintiff argues that upon realizing that, contrary to the CHCP, she was incapacitated and could not return to work, Defendant should have reconsidered her termination. (*Id.*) Plaintiff's assertions in this regard, however, are speculative at best, based only on theory and

her own beliefs. It is for that reason that the court has stricken these factual assertions. But even were the court to credit Plaintiff's interpretation of the situation, she has not established, nor is it evident from the record, that Defendant ever believed that the CHCP completed by Plaintiff's primary physician was countermanded, let alone erroneous. *See Thompson*, 522 F.3d at 177 (quoting *Bennett v. Saint-Gobain Corp.*, 507 F.3d 23, 31 (1st Cir. 2007)) (holding that "a plaintiff must show more than that the decisionmaker's perception was incorrect; he must show that the "decisionmaker did not believe in the accuracy" of the information that he was given."). Finally, the court finds unavailing Plaintiff's argument that "the absence of any cost-effective savings from terminating [her] employment and hiring a replacement" establishes that her termination was motivated by discrimination. In short, Defendant never asserted that Plaintiff was terminated as part of a cost-savings strategy.[2]

Because Plaintiff has failed to establish that Defendant's reason for her termination was pretextual, Defendant's motion for summary judgment on Counts I, II, and IV will be allowed.

## B.  *FMLA Violation(Count III)*

■  Although it is unclear whether Plaintiff is also alleging that Defendant violated her prescriptive rights under the FMLA, Defendant argues that it was under no obligation to restore Plaintiff to employment. Thus, Defendant asserts, even assuming that Plaintiff's leave had

been entirely FMLA-qualified, she was not able to return to work in any capacity until April of 2009, approximately ten months after her leave had begun and long after the expiration of the twelve week period to which she was entitled under the FMLA. *See Schumacher v. Fairfield Resorts, Inc.*, 2007 U.S. Dist. LEXIS 100247, No. CA 05–500 T, at *63 (D. R.I. June 8, 2007) (granting defendant's motion for summary judgment on FMLA claim because the plaintiff's medical absence exceeded the twelve week period guaranteed by the FMLA and it was undisputed that the plaintiff could not have returned to work at the expiration of that period); *see also Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 784–85 (6th Cir.1998) (holding that a company does not violate the FMLA when it terminates an employee who is incapable of returning to work at the end of the 12–week leave period allowed by the act).

Plaintiff does not address these arguments in any detail, much less dispute them. Plaintiff's opposition devotes only two sentences to her FMLA claim, maintaining that, despite assurances that her leave was approved, Defendant later considered her absence "unexcused." (Pl. Opp. at 20.) This obviously is insufficient to defeat Defendant's motion. Moreover, as Defendant points out, Plaintiff received all of the benefits to which she would have been entitled under the FMLA, including an offer of reinstatement if she could return to work at the end of the twelve week period. Thus, even assuming Plaintiff has asserted a claim that Defendant violated

---

**2.**  Plaintiff also asserts, and Defendant disputes, that Defendant retains the final decision over Lincoln Financial's handling of requests for short-term disability claims and that its denial of her claim is further evidence of pretext and Defendant's hostile attitude toward disabled employees. (Pl. Opp. at 18–19.) Yet even assuming that Defendant does maintain such authority, Plaintiff submits no

evidence that Defendant denied her claim for any reason other than those expressed in the letter from Lincoln Financial, namely, a dearth of evidence at the time supporting her claim that she was completely incapacitated. (*See* Ex. 17 (Letter from Lincoln Financial) (attached to Def. Mot. for Summary Judgment).)

her prescriptive rights under the FMLA, Defendant's motion for summary judgment will be allowed on Count III.

## IV. CONCLUSION

For the reasons stated, Defendant's motion for summary judgment is ALLOWED. This case may now be closed.

IT IS SO ORDERED.