# United States Court of Appeals
## For the First Circuit

No. 07-2723

NORYS I. GARCÍA; JOSÉ E. CASTELLAR-VELÁZQUEZ;
CONJUGAL PARTNERSHIP CASTELLAR-GARCÍA,

Plaintiffs, Appellants,

v.

BRISTOL-MYERS SQUIBB COMPANY; BRISTOL-MYERS SQUIBB MANUFACTURING
COMPANY; BRISTOL-MYERS SQUIBB CARIBBEAN COMPANY; RAFAEL VÉLEZ; JANE
DOE; CONJUGAL PARTNERSHIP VÉLEZ-DOE; AMÉRICO ABADÍA; CHELSEA ROE;
CONJUGAL PARTNERSHIP ABADÍA-ROE; GLENN GERECKE; JULIA DOE;
CONJUGAL PARTNERSHIP GERECKE-DOE,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Lipez, Circuit Judges.

Artemio Rivera Rivera for appellants.
Carl Schuster with whom Lourdes C. Hernández-Venegas and
Schuster Aguiló LLP were on brief for appellees.

July 23, 2008

**LYNCH**, <u>**Chief Judge**</u>.  Norys I. García, a chemical engineer employed for eighteen years by Bristol Myers Squibb Company in Mayagüez, Puerto Rico, brought a Title VII suit alleging the termination of her employment was motivated by gender discrimination and not, as the employer said, by poor performance. The district court entered summary judgment for the employer, finding no reasonable jury could conclude, in the face of the articulated reason, in plaintiff's favor.  In this highly fact-based case, we affirm the judgment.

I.

On September 15, 2005, García, along with her husband and their conjugal partnership, brought suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e <u>et seq.</u>, and Puerto Rico law, against her former employer, Bristol Myers Squibb and two of its subsidiaries (collectively "BMS"), as well as three individuals: Rafael Vélez, Américo Abadía, and Glenn Gerecke, and their respective wives and conjugal partnerships.  Vélez and Abadía were García's direct supervisors; Gerecke was their supervisor.

García alleged that the three men had built a case, based on negative performance evaluations, to justify firing García and that their real motivation was that she is a woman.  García alleged that she was subjected to "different treatment, evaluations, disciplinary process and mechanisms" compared to the other male project engineers.  García alleged that Gerecke discriminated

-2-

against her because he "condon[ed]" the discriminatory conduct of the other two. García sought compensatory and punitive damages of over $10 million as well as reinstatement to her job.

Defendants moved for summary judgment. The case was referred to a magistrate judge, who recommended denying summary judgment with respect to García's claim of sex discrimination. The district court did not accept this recommendation and held that summary judgment should be granted. García appealed. Because our review of the grant of summary judgment is de novo, Thompson v. Coca-Cola Co., 522 F.3d 168, 175 (1st Cir. 2008), we do not detail the reasoning used by either court.

A.      Factual Background

We review the record evidence, making all reasonable inferences in plaintiff's favor. Mellen v. Trs. of Boston Univ., 504 F.3d 21, 24 (1st Cir. 2007).

García's employment was terminated on January 24, 2005. García then held the position of Senior Project Engineer within the Facilities and Engineering Department. She was the only Senior Project Engineer in the department and was responsible for the administration of capital projects. This meant that she would work as the leader of teams comprised of representatives from several BMS departments and was ultimately responsible for the entirety of each project assigned to her. Her peers in the department were Eduardo Sánchez and Pedro Toro, who were both Project Managers, and

Manuel Orsini, an Engineering Technician.  During the time period in question she had two different direct supervisors, Rafael Vélez from February 2004 until her termination in January 2005 and Américo Abadía from August 2003 to February 2004.  Both had difficulty with her work.

B.        2003 Evaluations and Vélez's Arrival

In February 2004, a year before the employment termination, Abadía completed 2003 year-end evaluations for all of the employees under his supervision.  We consider these evaluations by Abadía insofar as they provide relevant background.

Abadía's evaluation of García, which they both signed on February 18, 2004, was markedly less positive than his evaluations of others he supervised.  In García's evaluation, which reflected comments from others about García, including from female employees, he wrote:

> Norys is a hard worker but needs to learn how to influence the organization in a positive way to get the job done with a level of comfort.  She is good at planning but when she encounters a pushback in the way she is approaching the task she gets upset and is able to accept alternate solutions with a level of difficulty.  "Her way is the best way". . .
> Norys needs to understand that be[ing] a team player within our environment is an important factor . . . .  Professionals that have worked with her feel uncomfortable in the way she approaches conflicting differences. She needs to be more proactive in modeling BMS Core Behaviors. . . .
> Another area that Norys has to address is in the presentation skills.  While she has

the required information her presentation
lacks the required structure to make sure that
attendees can grasp the understanding of the
subject at hand. . . .

In a sworn statement, Abadía stated that his review of García was based on his observations that "when she encountered resistance to differing opinions or suggestions, she would have difficulty receiving that feedback and would respond by getting upset and reacting as such." He also noted that García had been inadequately prepared for a presentation to the plant's Vice President and General Manager in late 2003, which Abadía had to cancel because it was "lacking the appropriate structure or completeness." As discussed below, García wrote a letter on August 4, 2004, complaining about several aspects of this evaluation, including Abadía's reliance on the opinions of people with whom García claimed she had not actually worked during the time period in question.

By contrast, Abadía had far fewer concerns about other employees in the department. His evaluations of Toro and Orsini, García's male co-workers, were overwhelmingly positive, and his evaluation of Sánchez expressed a few concerns but was still very strong:

Within the 7 months that I have worked with
Eduardo he needs to be more reactive to
resolving situations that come to his hand but
also increase the level of pro-activeness to
resolve situations before they become a
problem. Eduardo has the technical talent and

> also the administrative expertise to climb to his next performance step.
>
> Eduardo with his knowledge and expertise . . . can do more to increase the level of effectiveness of this department and for the overall organization. [He i]s considered within our operational community to be an[] excellent person to document [c]apital preparation documents the correct way.

García considers Sánchez to be her male comparator.

In February 2004, Abadía was promoted to Director of Manufacturing and was replaced as Director of Facilities and Engineering by Rafael Vélez. Vélez had previously served as Materials Manager and worked with García in that capacity; García characterized that working relationship as "normal" and did not indicate that there had been any problems between the two. Vélez testified that he had known García since he started working at BMS in approximately 1993.

In a sworn statement, Vélez stated that after his appointment as Director of Facilities and Engineering, he was informed that an internal audit had revealed deficiencies in the carrying out and documentation of equipment qualifications. These had been García's responsibility both as Senior Project Engineer and before that when she was Senior Qualification Engineer. As a result, BMS had transferred responsibility for the qualification process away from García.

On April 23, 2004, Vélez placed a warning letter in García's file critical of her job performance due to "inappropriate

administrative controls." The letter stated that García had violated several BMS internal procedures. On April 1, she had brought to Vélez's attention the need to extend a purchase order for an additional $30,000 to cover both a performance qualification for four lyophilizers and the process qualification for an external vial washer. On April 16, Vélez had learned that the qualification of the external washer had in fact been awarded as part of a previous change order, and also that three prior changes, all of which had included the lyophilizers, had also been made against the purchase order. As a result of all these changes, the original contract had increased from $20,000 to $88,950. Vélez's letter constituted an official warning, and cautioned García "to take immediate corrective action to prevent this situation from recurring and to exercise sound judgment when administering contract, terms and conditions set forth in Company internal controls." From Vélez's point of view, García's performance did not improve. García claims that she was not aware of the April 2004 warning letter until her deposition in this case, but she does not dispute the existence of the underlying cost overrun.

C.        García's Placement on a Performance Improvement Plan

On June 15, 2004, Vélez decided to place García on a ninety-day Performance Improvement Plan ("PIP"). Vélez stated that he decided to place García on the PIP because he "felt that García had not improved in the areas indicated by Abadía in his

evaluation, as well as in several additional areas that I had noticed from my own experience and observations of her performance during the months in which she had been under my supervision." For instance, he noted that he had "received negative comments from several persons involved in projects handled by García," including Humberto Cardona, Manufacturing Manager, Victor Mojica, Manufacturing Supervisor, and Frances Montes, Technical Services Scientist.

The PIP included a numbered list of García's "corrective action steps and job commitments," and stated these would be assessed at progress review meetings. These steps included, for instance: "Meet with project team members at least twice a month. Provide meeting minutes and next steps to team members." "Complete project within Budget. Provide monthly hour reconciliation per projects executed." The PIP also included a Job Development Plan which set out what García's immediate supervisor would do to assist her, what assistance García would need from other people or departments, what García could do to meet her commitments, and what she should accomplish during the probationary period.

Vélez met with García to discuss the PIP on July 12, and that same day she signed a form indicating that the PIP "has been reviewed and accepted for implementation." On August 4, García prepared a document for her human resources file expressing her reservations about the PIP. First, García complained that the PIP

was issued as a result of her 2003 assessment, to which she had objections. She documented those objections in a second document also dated August 4. Second, García noted that the 2003 assessment was based on the opinions of two women, María Pérez and Vanessa Colón, with whom García claimed she had never interacted during the period under review. Next, García asserted that she had asked Vélez to seek feedback on her 2003 performance from others who had worked with her, but he had indicated that he could not act upon the 2003 assessment. García also complained that the PIP addressed project administration skills that were not mentioned as areas of concern in the 2003 assessment: "It addresses Communication, Leadership and Alignment aspects different from the ones described in the performance appraisal. Rafael Vélez explained that the Performance Improvement Plan has to follow this format by procedure and cannot be changed." García's final objection to the PIP was that "[t]raining dates are not established to allow for proper planning."

As noted above, in a separate document for her human resources file also dated August 4, García objected to her 2003 assessment, which she had signed several months earlier on February 18. She now complained that "[g]eneral statements were used to support the summary of performance and capabilities section." She also objected that Abadía never provided direct feedback on presentation skills other than suggesting that visual aids should

-9-

include all the information to be discussed, which was a contrast from the previous director's preferences.  García summarized the work she had done on various projects, requested a re-evaluation, and asked for a larger merit increase in pay.

D.        Progress Reports

While García was on the PIP, she and Vélez met about four times to discuss her progress in meeting its goals.

García's first PIP progress report was dated August 9, 2004, less than a month after her first meeting with Vélez. According to this review, García was showing progress: she had issued minutes for three pending projects, submitted "Time and Events" updates for four projects, participated in the weekly safety meeting, and was applying the "stage gate" planning process required by the company.  García's second review, on September 13, was not quite as rosy.  It set forth several areas in which she had not met requirements, but also noted that García had acknowledged the situation and that she had explained that her absence had been due to a death in her family.

In early October 2004, García's mid-year review for the first part (January through approximately June) of 2004 was completed.  On this evaluation, done by Vélez, García received a rating of "Meets Expectations" in each of the seven categories being assessed:  "Leads Strategically," "Builds Alignment,"

"Communicates Directly," "Drives Performance," "Collaborates," "Energizes Others," and "Develops People."

Vélez testified that this mid-year evaluation is initially a self-assessment; García had assessed herself in some categories as "Exceeding Expectations" and he lowered that to "Meets Expectations." Vélez stated that at the time he and García met to discuss this mid-year evaluation, she was doing well on her PIP and he allowed the mid-year evaluation to reflect that: "During the first months of the PIP period, I noticed that García had shown some improvement on several areas set forth in the plan, as evidence[d] in her October 18, 2004 follow-up PIP Form. Therefore, in her mid-year evaluation of October, 2004, I rated her overall as 'meeting expectations'."

A third PIP assessment dated October 18, 2004, documented that García had submitted project progress reports, meeting minutes and updates, and "Times and Events" updates on active projects. However, it also stated that García was not consistent with respect to her participation in site safety audits, completing only two of four, and she attended only two of five weekly safety meetings. She also had struggled with the stage gate process for two of her projects, but the assessment noted that "[a]fter several coaching sessions . . . progress is be[ing] made towards using the process." The assessment also noted that García had been "coach[ed] to align expectations and close communication loops with customers to avoid

confusions"; that she had "demonstrated the capacity to reach for consensus on requirements"; and that she had received very strong feedback from her project team.  Specific requirements were laid out for the two projects for which she had not followed the stage gate process to assist her in meeting expectations.

On November 5, 2004, Vélez and Vanessa Colón from the Human Resources Department met with García and informed her that Vélez had decided to extend her PIP until December 15.  A PIP extension memorandum, written by Vélez, noted that García had made progress in her communication with others but needed to demonstrate consistency.  As for leadership, she needed to improve on her planning and time management skills and provide more detailed engineering work and alternate plans.  With respect to alignment, she had "demonstrated the capability to work on a team environment and approach issue resolution in a consensus with the team," but needed to demonstrate consistency.  The memorandum stated that García was to resubmit documents regarding two of the projects under her control to management by December 15.

Vélez and García did not meet to discuss her performance after November 5; Vélez said that this was because the time period between November 5 and the end of the PIP extension on December 15 was relatively short.

Vélez's final PIP review for García, dated December 30, 2004, covered her performance in November and December and was

markedly negative. It noted that although García submitted project progress reports for November and December for several projects, she was "not able to handle the pressure triggered by unfavorable and controversial issues. She presents an attitude of labeling . . . questions coming from stakeholders as personal threats and acts of hostile behavior make[] it very difficult to communicate with her."

The review also noted that García did not submit meeting minutes and updates on active projects during November and December, nor did she provide evidence of formal meetings with team members on active projects.

Although García submitted "Time and Events" updates during November and December, there was no evidence that García had met with or discussed these updates with the local team, as required. On December 8, she had sent Sánchez an email, without any previous discussion of the subject, stating that a project that had been under her control since June 2004 could not be executed because the equipment purchased was incorrect. The review also noted she was inconsistent in her participation in safety audits, attending only two of four, and she had attended only four out of twelve weekly safety meetings between October and December. Additionally, the review noted that García demonstrated no progress with the stage gate process during this time period and did not meet project milestones for several projects. She failed to

deliver the project documentations that had been due to management on December 15.

Moreover, the review noted several specific instances that "clearly demonstrate [García's] lack of consistent performance when handling projects." For instance, an October 29 communication from García to a supplier stated the terms and conditions for the transfer and storage of a tablet press about which she had not consulted her direct supervisor, a situation which "demonstrates her unilateral approach to implementing decisions without consultation to her one-over manager . . . that compromises basic company procedures and put[s] at stake the company['s] business relationship with suppliers." On November 12, García had written an email to a sourcing expert telling the expert to proceed with a purchase order for service, again without the authorization of her direct supervisor, and a "meeting was set immediately with purchasing to clarify the engineering role and the purchasing role in this negotiation." The review also noted that García had attended two training sessions, one on working with teams and one on BMS Core Behaviors, but she had refused to participate in a project management training because she felt that "it was too basic for her."

E.      Decision To Terminate García's Employment

Vélez made the decision to terminate García's employment on December 15, at the expiration of her second PIP. He

-14-

communicated this decision to Beatriz Sanabria, BMS's Human Resources Director, who instructed him to put together the necessary documentation. In a sworn statement, Sanabria stated that she began the termination process, which involved gathering the necessary documents and consulting with BMS's corporate legal department in New York, in response to Vélez's request. However, the process was delayed for several weeks and it was not until late January 2005 that she received final confirmation of the termination process as well as the documents necessary to offer García a severance package. On January 24, 2005, Sanabria and Vélez met with García to inform her of the termination decision and provide her with copies of her final PIP progress report and 2004 year-end evaluation.

Meanwhile, García went on vacation on December 17, 2004, and did not return until December 23. The circumstances surrounding her vacation are in dispute. Vélez claims that he ran into García several times on December 17 and she never inquired about a vacation request, and he had no knowledge that she had requested any specific vacation time. He had received only a December 8 inquiry from her regarding the payment of excess accrued vacation. García, on the other hand, claims that she made multiple efforts to contact Vélez about her desire to take vacation days so that they would not be lost at the end of the year, but received no response. The dispute is simply not material. At oral argument,

both parties agreed that García's vacation took place after Vélez had made the decision to terminate her, and thus her allegedly unauthorized use of vacation days should not be considered as a factor in the decision to fire her.

When García returned to work on December 23, Vélez gave her a written warning about her allegedly unauthorized use of vacation time. Apparently in response, on December 27, García filed a complaint with BMS's Department of Human Resources alleging that Vélez had discriminated against her on account of her sex. This was the very first time she raised the issue of gender-based discrimination.[1] Sanabria stated that she immediately conducted an investigation and that she "concluded that García's claims were based on her dissatisfaction with legitimate employment expectations from her supervisor, and not on sexual discrimination."

García's year-end evaluation for 2004, which Vélez signed on January 24, 2005, was negative. García received a "Needs Improvement" rating in each of the seven categories. Vélez's

---

[1] There is no copy of the complaint in the record so there is no information about the scope of the complaint. The record does contain a letter from García to Vélez, dated December 27, 2004, complaining that she had difficulty reaching Vélez and was not given "quality time" with him. The letter makes no mention of sexual discrimination per se but concludes: "The managerial practices toward employees in this Department are not uniform: there is a high degree of flexibility with the other employees (even when they fail); I have to struggle for my rights." It is not clear whether this is the "complaint" in question.

criticisms repeated and were consistent with those made in García's final PIP progress report, such as that she had trouble working well with others, reacted negatively to feedback, and blamed others when problems arose.

After García was fired, BMS was delayed in moving forward with two of the projects that she had been managing because they had difficulty finding "a person with the right set of skills." In early 2006, BMS hired Ángel González, a male, to replace García as Senior Project Engineer.

F.       Performance of Sánchez, a Claimed Comparison Employee

Vélez also completed an undated 2004 mid-year evaluation for Eduardo Sánchez. We assume, in García's favor, it was in the same time period as plaintiff's evaluation. In this evaluation, Sánchez was rated as "Meets Expectations" in six categories and as "Needs Improvement" in one ("Drives Performance"). The accompanying text made one criticism, that Sánchez failed to "consistently meet deadlines, commitments or objectives," although it also noted that Sánchez met other goals within the category of "Drives Performance," such as staying focused on objectives when competing priorities arose.

At some point after García's departure, BMS placed Sánchez on a PIP, a decision in which Vélez participated.

II.

We review a district court's grant of summary judgment de novo. <u>Thompson</u>, 522 F.3d at 175. "Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law" based on the record before the court. <u>Id.</u>

In the district court there was a great deal of attention to whether plaintiff had made out a prima facie case.[2] We will assume that García has made out a prima facie case in order to move on to the real issues in the case. <u>See, e.g.</u>, <u>Fennell</u> v. <u>First Step Designs, Ltd.</u>, 83 F.3d 526, 535 (1st Cir. 1996) ("On summary judgment, the need to order the presentation of proof is largely obviated, and a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a jury question as to

---

[2]    Under the framework articulated by the Supreme Court in <u>McDonnell Douglas Corp.</u> v. <u>Green</u>, 411 U.S. 792 (1973), a plaintiff who lacks direct evidence of discrimination establishes a presumption of gender discrimination by establishing that she is a member of a protected class; that an adverse employment action was taken against her; that she was otherwise qualified; and that her position remained open or was filled by a person with qualifications similar to hers. <u>See</u> <u>id.</u> at 802; <u>see also</u> <u>Douglas</u> v. <u>J.C. Penney Co., Inc.</u>, 474 F.3d 10, 13-14 (1st Cir. 2007). Once a plaintiff makes out a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the dismissal; the plaintiff must then show that the defendant's articulated reason is pretextual and that the defendant's action was in fact motivated by prohibited discrimination. <u>Douglas</u>, 474 F.3d at 14; <u>Straughn</u> v. <u>Delta Air Lines, Inc.</u>, 250 F.3d 23, 33-34 (1st Cir. 2001).

-18-

pretext and discriminatory animus."); see also Kosereis v. Rhode Island, 331 F.3d 207, 213 (1st Cir. 2003) ("[I]n disparate treatment cases, comparative evidence is to be treated as part of the pretext analysis, and not as part of the plaintiff's prima facie case . . . ."). BMS has identified a legitimate, non-discriminatory reason for firing García: her deficient performance. See Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 100 (1st Cir. 2007) (defendant employer stated a legitimate reason for firing employee because of her failure to follow instructions regarding a presentation to superiors). Thus we focus on whether García has provided sufficient evidence to demonstrate that this explanation is a pretext and that a motivating factor for her termination was her gender. "At summary judgment, this question reduces to whether or not the plaintiff has adduced minimally sufficient evidence to permit a reasonable factfinder to conclude that [she] was fired because of [her gender]." Dávila v. Corporación de P.R. para la Difusión Pública, 498 F.3d 9, 16 (1st Cir. 2007).

García has presented two major themes of differential treatment based on gender. The first is that her "Meets Expectations" assessment of October 2004 is inconsistent with Vélez's decision to place her on a PIP and ultimately to terminate her employment on December 15, 2004. That inconsistency raises suspicions, she asserts, that the explanation that her performance

was inadequate was not true. She argues that the more likely reason was Vélez's hostility to her as one of the few female engineers at the company. She also explains her being placed on a PIP as discriminatory given that her prior evaluations by supervisors before Abadía and Vélez did not lead to her losing her job.

The second theory is that male employees who had performance problems, notably Sánchez, were not placed on PIPs and their employment was not terminated. Her sub-theme is that the PIP she was placed on was impossible for her to meet and that no male was given such onerous projects. We start with this second theory.

A.        Male Comparators

A plaintiff can demonstrate that an employer's stated reasons are pretextual "in any number of ways," including by producing evidence that plaintiff was treated differently from similarly situated employees. Kosereis, 331 F.3d at 214. "To successfully allege disparate treatment, a plaintiff must show 'that others similarly situated to [her] in all relevant respects were treated differently by the employer.'" Id. (quoting Conward v. Cambridge Sch. Comm., 171 F.3d 12, 20 (1st Cir. 1999)). The comparison cases "need not be perfect replicas," but they must "closely resemble one another in respect to relevant facts and circumstances." Conward, 171 F.3d at 20.

García makes several arguments as to how she was treated differently from her male peers. Most prominently, she points to the disparity between Sánchez's 2004 mid-year evaluation and her own and claims that because she received ratings of "Meets Expectations" in all categories whereas Sánchez received one rating of "Needs Improvement," it was he, and not she, who should have been placed on a PIP.

García's argument, however, ignores the timeline of events. When Vélez made the decision to place her on a PIP in June 2004, she and Sánchez were by no means similarly situated. She had received a far more negative 2003 year-end assessment from Abadía than Sánchez had. Additionally, Vélez had been informed about problems with García's oversight of equipment qualifications which had required transferring that responsibility to a different department, and he had issued García a warning in April for her failure to follow internal protocols. García's mid-year evaluation was not completed until October, several months after Vélez decided to place her on a PIP, and he stated that he gave García relatively good ratings on this mid-year evaluation because she had been demonstrating improvement since being placed on the PIP. García has not rebutted any of these facts.[3]

---

[3]    Even if it is true that García had not seen the April 2004 warning letter, the important aspect of this warning is not whether García saw it but that it demonstrates problems in her behavior about which Vélez was concerned. García does not dispute that there were significant cost overruns in a project she was

García also claims that she was treated differently because she was assigned more difficult projects than her peers while she was on the PIP; because Vélez made it more difficult for her than for her male co-workers to communicate with him; because she was not allowed to attend a training on the stage gate process; and because Sánchez was not disciplined for purchasing incorrect equipment. None of these allegations are supported by the record.

García argues that "[a]bout the same time [she was] put on probation through her PIP, Vélez assigned García various old projects that had been previously assigned to other project engineers and that nobody had been able to finalize." BMS contests this allegation, but even assuming that it is true, García has not demonstrated that she was treated differently from similarly situated male peers. For one thing, she was the only person with the title of Senior Project Engineer and she had different job responsibilities from the others in her department. Moreover, she has not provided any evidence regarding men at BMS who were placed on PIPs and whether they were also assigned old projects.

As for Vélez's communication with García, she claims that she had trouble getting in touch with him, in particular with respect to her request regarding vacation days in December. Even if we credit García's version of the facts, which defendants contest, her only evidence that similarly situated men were treated

managing, which were the subject of the warning.

differently consists of the following exchange from Sánchez's deposition:

> Q: Have you ever had a problem reaching Mr. Vélez, or having him . . . answer your calls?
> A: If he's available, he will return my call; if he's not available, there have been times in which I have called him and he has not been able to call me back.
> Q: But is it the norm that it is difficult for you to get a hold of him . . .[?]
> A: No, no, the time that I have called him, if he's available, he would return my call at that time or later on.

This exchange does not indicate that Sánchez never had trouble reaching Vélez; on the contrary, it indicates that Vélez sometimes was not able to call Sánchez back, at least not immediately. This testimony hardly shows that Vélez communicated better with male employees than he did with García.

As for the stage gate process training, García alleges that everyone else in the department went to the off-site training but Vélez asked her to stay at the plant to assist with an audit. After they returned, Vélez and Sánchez filled García in and gave her notes to review. García has not shown that it was not necessary for her to stay at the plant and assist with the audit, nor has she rebutted defendants' contention that she did not need to attend the training because she had already attended the same training the previous year.

-23-

García also claims that Sánchez purchased the wrong equipment while working on a project she was managing. At deposition, she asserted that she, as the project manager, was given a warning because she made mistakes regarding installation and communicating with the financial department, but he was not given a warning for purchasing the wrong equipment.[4] García provides no evidence to support this allegation, but even assuming that it is true, García and Sánchez were not in the same position. García was directly responsible for the entire project and made different mistakes than Sánchez did.[5]

---

[4] García's testimony is not entirely clear, but it appears that this warning was not the same one that Vélez gave her in April 2004, and instead this warning was given to her sometime in November 2004. The record does not contain a copy of this warning or any other references to it.

[5] In an unsworn statement on December 7, 2006, García alleged that a project under Pedro Toro's control was a "complete failure" in several respects, and she also made additional allegations about Sánchez's purchasing incorrect equipment. This should not have been considered in the district court for a number of reasons: it is not competent evidence and it is inconsistent with her deposition testimony and that discrepancy has not been explained. Additionally, her counsel has now disavowed reliance on it.

This unsworn statement came in response to defendants' motion for summary judgment. It contained several allegations that were not in the original complaint nor made during García's deposition. Defendants urge us to ignore this unsworn affidavit as a "sham" because it contradicts García's deposition testimony. When questioned about the affidavit at oral argument, plaintiff stated that she was not relying on it but rather on the documents in the record.

A court is "not obliged to accept as true or to deem as a disputed material fact[] each and every unsupported, subjective, conclusory, or imaginative statement made to the Court by a party." Torrech-Hernández v. Gen. Elec. Co., 519 F.3d 41, 47 (1st Cir.

Thus, as in Kosereis, "all of the instances of disparate treatment cited by [García] . . . are either unsupported by the record or are distinguishable in important respects from the facts and circumstances that [García] faced." Kosereis, 331 F.3d at 216.

B.          Theory That Employer Was Inconsistent

As to plaintiff's first theory, that too is not supported by the evidence. The record contains no direct evidence of gender bias by Vélez -- no offensive statements or smoking guns.[6]  The seeming inconsistency between the October performance evaluation and the December 15 termination decision disappears when seen in context. Even before Vélez was promoted to be her supervisor, García's former supervisor found problems with her work. Those problems were consistent in kind with the problems Vélez found in his evaluation of her work. Vélez also had other sources of information confirming García's performance problems, such as the internal audit reports and complaints from other employees. García has not demonstrated that there are "'weaknesses, implausibilities,

_____

2008). Here García made new allegations in an unsworn affidavit after stating at deposition that she had put forth every incident of disparate treatment she knew of, and then she disavowed reliance on the affidavit before this court. We thus do not credit allegations made in García's unsworn affidavit that are not otherwise supported by the record.

[6]     In her unsworn statement, García alleged that Vélez told her that she could not attend the stage gate training because she was to stay at the plant working with the FDA on an audit and that "women stay at home." Again, we do not credit allegations in the unsworn statement that are not otherwise supported by the record.

-25-

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons' such that a factfinder could 'infer that the employer did not act for the asserted non-discriminatory reasons.'" Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 56 (1st Cir. 2000) (quoting Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 168 (1st Cir. 1998)).  The record more than adequately demonstrates García's poor work performance and the deterioration of her performance over the course of her PIP, which she essentially does not dispute.[7]  Similarly, the record does not provide any support for the proposition that the evaluation process itself was tainted by gender bias.  See Thomas v. Eastman Kodak Co., 183 F.3d 38, 64-65 (1st Cir. 1999).

At most García questions whether her performance problems should have led to the termination of her employment.  But even if that were questionable, there is absolutely no evidence that Vélez's decision was motivated by gender bias.  Indeed, the inferences run against García.  If Vélez truly were determined to see a woman in her position fail, it is unlikely he would have

_____

[7]  García put into the record two generally positive evaluations from members of a project team she led which are dated October 11 and 13, 2004.  These evaluations are consistent with Vélez's relatively upbeat October 18, 2004 PIP progress report.  García also put into the record a handful of emails containing various updates and meeting minutes she had sent in July, August, November, and December, but these were acknowledged in her PIP progress reports.  Indeed, García does not challenge the accuracy of these reports' assessment of the specific performance benchmarks set forth in the PIP.

-26-

noted the short-term improvements in her PIP performance or extended her PIP to give her more time to meet expectations. Moreover, both Abadía and Vélez have promoted several women during their tenures at BMS.  In his sworn statement, Abadía identified five women he hired or promoted to professional or managerial positions within the company, and Vélez identified two.

### III.

García has not provided sufficient evidence showing that defendants' explanation for firing her was a pretext and the real reason was discrimination to reach a jury.  We affirm the district court's grant of summary judgment for defendants.