# United States Court of Appeals
## For the First Circuit

No. 09-1895

REBECCA LOCKRIDGE,

Plaintiff, Appellant,

v.

THE UNIVERSITY OF MAINE SYSTEM,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Torruella, Boudin and Howard,
Circuit Judges.

Eric M. Mehnert, with whom Hawkes & Mehnert, LLP, was on brief, for appellant.
Kai W. McGintee, with whom Patricia A. Peard and Bernstein Shur, were on brief, for appellee.

March 10, 2010

**HOWARD**, **Circuit Judge**.    In 2008, Professor Rebecca Lockridge sued her employer, the University of Southern Maine, claiming, among other things, three violations of Title VII (42 U.S.C. § 2000e et seq.):  (1) gender discrimination (relating to the denial of a pay raise); (2) retaliation (relating to the denial of her request to move to another office); and (3) hostile work environment (relating to various incidents that occurred during her tenure at the University).  The district court, adopting a magistrate judge's recommendation, granted summary judgment to the University on all three claims.  Lockridge appeals.  After review, we affirm.

## I.

The facts, discussed at length in the magistrate judge's decision, Lockridge v. Univ. of Me. Sys., No. 08-146-P-S, 2009 U.S. Dist. LEXIS 38544, at *4-30 (D. Me. Apr. 23, 2009), can be briefly summarized.  Because summary judgment was granted against Lockridge, we state these facts in the light most favorable to her, drawing all reasonable inferences in her favor.  Rathbun v. Autozone, Inc., 361 F.3d 62, 64 (1st Cir. 2004).

In 1984, Lockridge began work at the University as an Assistant Professor of Communication.  Her position was tenure-track and part of the University's Department of Communications.[1]

_____

[1] Sometime in 2003 or 2004, the University decided to combine the Department of Communications and its Media Studies program to create a new department, the aptly named "Department of

-2-

From 1985 to 2008, Lockridge suffered through a number of incidents at work. In addition to incidents we will discuss separately and in greater detail, the record contains evidence of the following:

> In 1985, a fellow professor, Leonard Shedletsky, made what Lockridge considered to be sexually inappropriate overtures toward her on two separate occasions. When Lockridge rejected these overtures, Shedletsky began to appear difficult and angry with her. In 1989, in his capacity as a member of a tenure evaluation committee assigned to review Lockridge, Shedletsky recommended that Lockridge not be granted tenure. Despite his recommendation, Lockridge was ultimately given tenure.
>
> In 1992, Lockridge became Chair of the Department of Communications. Shedletsky chafed under Lockridge's authority, frustrating her ability to carry out her responsibilities as Chair. Eventually, Shedletsky requested that the Dean remove Lockridge from her position. During a meeting in 1993, faculty members voted to remove Lockridge as Chair. Immediately after this meeting, an article entitled "Accused of Sexual Harassment," which had been written by Shedletsky, was placed in Lockridge's on-campus mailbox.
>
> From 1991 to 2006, Lockridge, during various work-related activities, heard a fellow professor, Richard West, make at least seven sexually charged "jokes" or comments, most concerning either his status/lifestyle as a gay male or his sexual organs.

---

Communications and Media Studies." For ease of exposition, and because it makes no difference in our analysis, we will refer to Lockridge's department as the Department of Communications throughout this opinion.

-3-

In 2006, Lockridge came up for "post-tenure" review. This review consisted of professors being evaluated over a four year period in three areas: teaching, service, and scholarship. Professors who received a satisfactory rating in all three areas were eligible for a pay raise.

The peer review committee assigned to review Lockridge rated her scholarship "unsatisfactory." Not pleased by this, Lockridge wrote a letter to Devinder Malhotra, the Dean of the College of Arts and Sciences, questioning whether there was "gender bias at work." Malhotra thereafter conducted an independent review of Lockridge's scholarship and also rated it "unsatisfactory." Malhotra noted that at the time of Lockridge's review, she had not published a book or juried/peer reviewed article in approximately fourteen years, and that during the four-year review period, she had produced only "four conference presentations and a chapter in a book." Because of this unsatisfactory scholarship rating, Lockridge was denied a pay raise. Convinced that she was denied a pay raise because she was a woman, Lockridge filed a complaint with the Maine Human Rights Commission (MHRC) in December 2006.

Not long after this, in May 2007, the University reviewed a tenured male professor in the Department of Communications, Russell Kivatisky. The peer review committee assigned to review Kivatisky, which included Lockridge, rated his scholarship "satisfactory" despite the fact that he had published less than

Lockridge during the four-year review period. In reviewing his scholarship, however, the committee noted that Kivatisky was on a "non-scholarly track for evaluation." Non-scholarly track professors are not expected to produce scholarship at the same rate as scholarly track professors.

During this time period, Lockridge, like many faculty members in the Department of Communications, worked out of a satellite office on the University's campus. These satellite offices were necessary due to the limited space in the Department's hub, the Chamberlain Street building. Sometime in late 2007 or early 2008, however, an office in the Chamberlain Street building became available. Because these offices were desirable -- they were located at the Department's center and had direct access to the Department's administrative support staff -- they were typically assigned based partially on seniority. Lockridge requested that she be given the vacant office. The University denied her request. When explaining the denial to Lockridge in a letter, Kivatisky, who had become the Department Chair, wrote, "given the continuing legal issues[2], I want to be particularly sensitive to the climate in the office and the working environment of the staff." Kivatisky also told Lockridge that, "Some find your attitude toward them to be demeaning. They find this ironic given

---

[2] The parties appear to agree that Kivatisky was referring to the 2006 administrative complaint filed by Lockridge.

your feminist stance . . . ."  The University later assigned the office to a female faculty member less senior than Lockridge.

In February 2008, Lockridge sued the University in Maine state court, claiming, inter alia, gender discrimination (based on the denial of a pay raise) and retaliation (based on the denial of her office request).  Lockridge also brought a hostile work environment claim, relying on all of the acts discussed above.  The University removed the case to federal court and, in due time, moved for summary judgment, which was granted.  This appeal ensued.

**II.**

We review a district court's grant of summary judgment de novo.  Rodi v. S. New Eng. Sch. of Law, 532 F.3d 11, 15 (1st Cir. 2009).  Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).[3]

A. Gender discrimination

Title VII prohibits employers from discriminating against an employee with respect to her compensation on the basis of

---

[3] A "material" fact is one "that might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" only "if a reasonable jury could resolve it in favor of either party."  Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004) (quoting Basic Controlex Corp., Inc. v. Klockner Moeller Corp., 202 F.3d 450, 453 (1st Cir. 2000)).

gender.  42 U.S.C. § 2000e-2(a)(1).  Here, Lockridge claims that the University denied her a pay raise because she was a woman.

Because Lockridge failed to proffer any direct evidence of gender discrimination, her claim is generally governed by the burden shifting scheme set out by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Garcia v. Bristol-Myers Squibb Co., 535 F.3d 23, 31 n.2 (1st Cir. 2008).  Under this scheme, a plaintiff-employee must first establish a prima facie case of gender discrimination.  Kosereis v. Rhode Island, 331 F.3d 207, 212 (1st Cir. 2003).  The elements of the prima facie case vary according to the nature of the plaintiff's claim, but the plaintiff must show, among other things, that she suffered an adverse employment action.  Garcia, 535 F.3d 31 n.2.  If the plaintiff establishes this prima facie case, the burden of production -- but not the burden of persuasion -- shifts to the employer, who must articulate a legitimate, non-discriminatory reason for the adverse employment action.  See id.  If the employer does so, the focus shifts back to the plaintiff, who must then show, by a preponderance of the evidence, that the employer's articulated reason for the adverse employment action is pretextual and that the true reason for the adverse action is discriminatory.  Smith v. Stratus Computer, 40 F.3d 11, 16 (1st Cir. 1994).

We will assume for the sake of analysis that Lockridge has met her modest burden of establishing a prima facie case.  See

-7-

Garcia, 535 F.3d at 30-31. The University, in turn, has met its burden of production, as it has identified a legitimate, non-discriminatory reason for denying Locrkidge a pay raise: her unsatisfactory scholarship. For purposes of the summary judgment analysis, then, the question reduces to whether Lockridge has identified evidence that would enable a reasonable jury to find that the University's proffered reason is pretextual and that Lockridge was in fact denied the pay raise because she was a woman. Id. at 31.

Lockridge focuses most of her efforts on exposing the University's proffered reason as pretextual. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 517 (explaining that "proving the employer's [articulated] reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination")[4]. She proceeds on a differential treatment theory, reasoning that the University's "unsatisfactory scholarship" explanation must be pretextual because the University gave a similarly situated male professor, Russell Kivatisky, a satisfactory scholarship rating despite the fact that he published less than she. See Garcia, 535 F.3d at 31 (recognizing that "[a] plaintiff can demonstrate that an employer's

---

[4] Indeed, "[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." Id. at 511.

stated reasons are pretextual . . . by producing evidence that [the] plaintiff was treated differently from similarly situated employees").

But to prove differential treatment at trial, Lockridge would need to show that Kivatisky was similarly situated to her "in all relevant respects." Id. (quoting Kosereis, 331 F.3d at 214); Conward v. Cambridge Sch. Comm., 171 F.3d 12, 20 (1st Cir. 1999) (noting that the comparison cases "must closely resemble one another in respect to relevant facts and circumstances"). She cannot hope to do so. At the time of his review, Kivatisky, unlike Lockridge, was on a "non-scholarly" track. Lockridge acknowledged as much when she, as a member of the peer review committee evaluating Kivatisky, signed a letter to the Dean which read, "When considering scholarship, the committee noted that Russ [Kivatisky] has been on a 4-4 teaching load for the past two academic years and, therefore, sets up a non-scholarly track for evaluation." (emphasis added). The difference between scholarly track professors and non-scholarly track professors is material in this case. Non-scholarly track professors are not expected to produce scholarship at the same rate as scholarly track professors.[5]

Lockridge attempts to draw the sting of this letter by calling into question the peer review committee's statement that

---

[5] At no point has Lockridge claimed that non-scholarly track professors are situated similarly to scholarly track professors.

-9-

Kivatisky's "4-4 teaching load" put him on a non-scholarly track. She notes that, when deposed, the current Department Chair, Dan Panici, testified that a professor who carries a 4-4 teaching load is not exempt from scholarship obligations.

This testimony, however, is not necessarily inconsistent with the statement made in the letter. A professor carrying a 4-4 teaching load may well have minor scholarship obligations that do not disqualify the professor from being on a non-scholarly track. In any event, even if Panici's testimony does cast some doubt on the statement made in the letter, the fact remains that Lockridge herself endorsed this statement and explicitly acknowledged Kivatisky's different scholarship obligations. Though given an opportunity, she has yet to adequately explain why she did so.[6]

Ultimately, given the material difference between Kivatisky and Lockridge, and the lack of any other evidence suggesting that the University's proffered reason was pretextual, Lockridge's gender discrimination claim (to the extent it is premised on differential treatment) fails as a matter of law. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149 (2000) (explaining that judgment as a matter of law is appropriate where

_____

[6] At oral argument, when asked why Lockridge signed the letter, Lockridge's counsel theorized that Lockridge signed it because of hostile pressures in her work environment. But, because he could not provide any record support for this theory, this amounts to "unsupported speculation" which is insufficient to forestall summary judgment. See Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000).

"there is no legally sufficient evidentiary basis for a reasonable jury to find for [a] party on [a particular] issue").

In a last gasp effort, Lockridge claims that, at the very least, the University had "mixed motives" when denying her the pay raise. To prevail on a mixed-motive theory of discrimination, Lockridge would need to establish that the decision to deny her a pay raise was at least partially motivated by her status as a woman. <u>Sher</u> v. <u>U.S. Dep't of Veterans Affairs</u>, 488 F.3d 489, 508 n.22 (1st Cir. 2007). She cannot do so as a matter of law. Although Lockridge claims that the various incidents that occurred at the University between 1985 and 2006 serve as circumstantial evidence that the decision to deny her a pay raise was motivated by her gender, the incidents she identifies have no discernible connection to that decision.

## B. <u>Retaliation</u>

Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a), seeks to prevent employers from retaliating against an employee for attempting to enforce rights under Title VII. <u>DeCaire</u> v. <u>Mukasey</u>, 530 F.3d 1, 19 (1st Cir. 2008). In relevant part, the retaliation provision makes it illegal "for an employer to discriminate against any of his employees . . . because he has opposed any practice made [] unlawful by [this subchapter] . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under

-11-

this subchapter.  42 U.S.C. § 2000e-3(a).  Lockridge claims that after she filed a discrimination complaint with the MHRC, the University retaliated against her by denying her request for an office in the Chamberlain Street building.

Lockridge's retaliation claim, like her gender discrimination claim, is generally governed by McDonnell Douglas' burden shifting scheme.  Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 25-26 (1st Cir. 2004).  Accordingly, Lockridge must first establish a prima facie case of retaliation by showing that (1) she engaged in a statutorily protected activity; (2) she suffered a materially adverse employment action; and (3) the protected activity and the adverse employment action were causally connected.  Marrero v. Goya of P.R., Inc., 304 F.3d 7, 22 (1st Cir. 2002).  The primary dispute in this case is over the second factor, whether Lockridge suffered a materially adverse employment action.

To be materially adverse, the challenged employment action must be one that could "'dissuade a reasonable worker from making or supporting a charge of discrimination.'"  Dixon v. Int'l Bhd. of Police Officers, 504 F.3d 73, 81 (1st Cir. 2007) quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006)).  This is an objective test and "'should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'"  Burlington N. & Santa Fe Ry.

Co., 548 U.S. at 71 (quoting Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81 (1998)).

In its decision recommending summary judgment for the University, the magistrate judge ruled that the denial of an employee's request for office space cannot, as a categorical matter, be a materially adverse employment action. We disagree. After Burlington Northern, employment actions are less susceptible to categorical treatment when it comes to the question of whether they are or are not materially adverse. We think that, under certain circumstances, the denial of an employee's request for office space could dissuade a reasonable person from making or supporting a charge of discrimination. Indeed, we have previously concluded that "disadvantageous transfers or assignments" can be materially adverse, although in the context of conditions more severe than those attending the usual employee office space request. See Valentin-Almeyda v. Municipality of Aguadilla, 447 F.3d 85, 95 (1st Cir. 2006) (finding a totality of assignments, which included a police officer's transfer for an "unusually long" duration to a "remote and solitary" duty site that was "regarded as punishment" by officers, to constitute adverse employment action).

Moving from the general to the specific, the question becomes whether the University's denial of Lockridge's particular request for office space amounted to a materially adverse employment action. In arguing that it did, Lockridge says that the

Chamberlain Street office that she desired had distinct advantages over the satellite office she occupied, namely, administrative support, more opportunities for professional interaction and development, and better access to information about Department goings-ons. These allegations find some support in the record, although neither very particular nor strong. Lockridge testified during discovery that the lack of administrative support took time away from her research and writing and that being separated from faculty members in the Department hub made her feel "excluded and ostracized." She also entered into evidence an email exchange with Kivatisky in which she complained that her location in the satellite office "excluded [her] from the informal exchanges of information that occur on an impromptu basis with the result that I often feel uninformed about the structure, curriculum, and direction of the Department."

Regardless, on the undisputed record, Lockridge's continued location in a satellite office was not unique. The attendant inconveniences may not have been optimal, but neither did they affect Lockridge more adversely than they did some of her colleagues. Lockridge herself observes that other faculty members within the Department, including those senior to her such as Shedletsky, were similarly located in satellite offices. So, although Lockridge's request for a better office may have been a reasonable one, the fact remains that the denial left her in no

worse a position than that held by similarly situated faculty members.  Under these circumstances, we cannot see how one could find that the denial of Lockridge's request could "dissuade a reasonable worker from making or supporting a charge of discrimination." Burlington Northern, 548 U.S. at 57.

### C.  Hostile work environment

"Title VII's ban on employment practices . . . extends to sex-based discrimination that creates a hostile or abusive work environment." Billings v. Town of Grafton, 515 F.3d 39, 47 (1st Cir. 2008).  This type of hostile or abusive work environment is generally referred to as "sexual harassment." Id.  Lockridge claims that, beginning in 1989, she was subjected to a hostile work environment within the Department of Communications.

To establish a claim of "hostile work environment sexual harassment," a plaintiff must demonstrate "that the harassment was sufficiently severe or pervasive so as to alter the conditions of the plaintiff's employment and create an abusive work environment." Forrest v. Brinker Int'l Payroll Co., LP, 511 F.3d 225, 228 (1st Cir. 2007).  In support of her claim, Lockridge identifies a number of incidents that occurred between 1989 and 2008.  These incidents include:  (1) Shedletsky's 1989 recommendation denying her tenure after Lockridge's rejection of his alleged sexual overtures; (2) the placement of a sexual harassment article in her work inbox in 1993 after she was removed as Department Chair; (3) West's various

jokes and comments about sex and sexuality that occurred between 1991 and 2006; (4) the University's decision to deny her a pay raise in 2006; and (5) the University's decision to deny her request for office space in 2008.

In its defense, the University argues that Lockridge's claim fails as a matter of law because it relies predominantly on untimely acts, specifically, acts that occurred before February 22, 2006 (which is as far back as the statute of limitations reaches). Lockridge, although conceding that most of the aforementioned acts fall outside the limitations period and are integral to her claim, argues that the "continuing violation doctrine" permits her to rely on the untimely acts. This doctrine, an equitable exception to Title VII's statute of limitations, "allows an employee to seek damages for otherwise time-barred allegations if they are deemed part of an ongoing series of discriminatory acts and there is 'some violation within the statute of limitations period that anchors the earlier claims.'" O'Rourke v. City of Providence, 235 F.3d 713, 730 (1st Cir. 2001) (quoting Provencher v. CVS Pharmacy, 145 F.3d 5, 14 (1st Cir. 1998)).

For the continuing violation doctrine to apply, Lockridge needs to establish that a discriminatory "anchoring act" occurred within the limitations period. Noviello v. City of Boston, 398 F.3d 76, 86 (1st Cir. 2005). To qualify as an anchoring act, the discriminatory act must "substantially relate[] to [the] earlier

incidents of abuse." Id.; Sabree v. United Bhd. of Carpenters &
Joiners Local No. 33, 921 F.2d 396, 401 (1st Cir. 1990).[7]
Lockridge purports to identify two anchoring acts:  the 2006 pay
raise denial and the 2008 office space denial.

Neither qualifies as an anchoring act.  For reasons
already discussed, the identified acts are not actionable as a
matter of law.  Lawton v. State Mut. Life Assur. Co. of Am., 101
F.3d 218, 222 (1st Cir. 1996) ("Common sense teaches that a
plaintiff cannot resuscitate time-barred acts, said to be
discriminatory, by the simple expedient of linking them to a non-
identical, non-discriminatory, non-time barred act.") (emphasis
added).

Our conclusion that Lockridge cannot avail herself of the
continuing violation doctrine sounds the death knell for her
hostile work environment claim.  Without reliance on the untimely
events, the claim fails as a matter of law.

**III.**

For the reasons provided above, we **affirm** the entry of
summary judgment for the University on all claims.

**Affirmed.**

---

[7] In O'Rourke, we explained that a court, when ascertaining
whether an anchoring act is "substantially related" to an untimely
act, should ask if the subject matter of the anchoring act is
"sufficiently similar" to that of the untimely act.  235 F.3d at
731.