Wen Y. CHIANG, Plaintiff,

v.

MBNA (A Bank of America Company) and Fia Card Services, N.A., Defendants.

Civil Action No. 06–12258–PBS.

United States District Court, D. Massachusetts.

July 9, 2009.

Dean Carnahan, Law Offices of Dean Carnahan, Arlington, MA, for Plaintiff.

Abraham J. Colman, Felicia Yu, Terry B. Bates, Van T. Lam, Amir Shlesinger, Reed Smith LLP, Los Angeles, CA, Bruce D. Berns, Abendroth, Berns & Warner LLC, Wellesley, MA, for Defendants.

## MEMORANDUM AND ORDER

SARIS, District Judge.

## I. *INTRODUCTION*

Defendant FIA Card Services, N.A. ("FIA")[1] moves for summary judgment on Plaintiff Wen Y. Chiang's claim alleging a violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681s–2(b). Defendant argues that undisputed material facts demonstrate that it did not receive notice of the underlying dispute from a consumer reporting agency, as is required to sustain an action under 15 U.S.C. § 1681s–2(b). I *ALLOW* Defendant's motion for summary judgment.

## II. *FACTUAL BACKGROUND*

On August 26, 2005, Mr. Chiang opened a line of credit, account number ending in 9211 ("the Account"), with MBNA America Bank, N.A. On December 16, 2006, Mr. Chiang filed this lawsuit, alleging that MBNA inaccurately reported delinquent payments on his credit card and closed the Account, damaging his credit and causing a "gross disruption" to his business.[2] (Second Am. Compl. ¶ 19.[3]) Mr. Chiang asserts that, after he discovered that the Account had been closed with a delinquency report,[4] he contacted one or more credit reporting agencies to dispute the negative information reported by Defendant. (Second Am. Compl. ¶ 17; *see* Pl.'s Resp. To Def.'s [First] Statement of Undisputed Facts, Ex. C [Docket No. 67].) Mr. Chiang alleges that a credit reporting agency then notified Defendant of his complaint, therefore triggering Defendant's obligation under the FCRA to conduct an investigation and to modify, delete, or correct the erroneous information promptly. (Second Am. Compl. ¶¶ 18, 20.) It is this assertion—that a credit reporting agency actually notified Defendant of a complaint by Mr. Chiang about erroneous information on his Account—that Defendant contends is unsupported by the evidence.

This case has a long and winding procedural history, but here I will only address

1. Both MBNA and FIA Card Services, N.A. are named as defendants in the Second Amended Complaint. (Docket No. 19.) Following the merger of MBNA America Bank, N.A. and Bank of America in 2006, MBNA's name changed to FIA. "FIA and MBNA are the same organization. . . ." *Chiang v. MBNA,* No. 06–cv–12258, 2007 WL 2399185, at *3 (D.Mass. Aug. 22, 2007).

2. Plaintiff initially brought several other claims, but only his claim alleging violation of the FCRA, specifically violation of 15 U.S.C. § 1681s–2(b), remains.

3. The Second Amended Complaint [Docket No. 19] is the governing complaint. (*See* Order on Pl.'s Mot. to Am. Second Am. Compl. (denying motion seeking admission of a Third Amended Complaint) [Docket No. 36].)

4. Mr. Chiang makes several conflicting statements regarding when he discovered that his MBNA account had been closed. In the complaint, he states that the discovery was in November 2006 when his request for a credit increase was denied due to a history of delinquency. (Second Am. Compl. ¶¶ 6–7.) In his first response to Defendant's Statement of Undisputed Facts [Docket No. 67], Mr. Chiang submitted copies of multiple letters he purports to have written to credit reporting agencies about the delinquency report. Some of the letters are dated October 28, 2006, suggesting he had knowledge prior to November 2006. Yet in some of the letters, Mr. Chiang indicates that he learned of the issue in September 2006. It is not entirely clear in the record whether the Account was ever actually reported as delinquent by Defendant.

the progression of Defendant's multiple motions for summary judgment. On March 19, 2009, this Court declined to adopt the magistrate judge's recommendation that Defendant's initial motion for summary judgment be allowed. This Court concluded that summary judgment was inappropriate because there was a fact dispute as to whether Mr. Chiang sent a letter identifying his dispute to a credit reporting agency in October 2006. The Court permitted additional discovery of the credit reporting agencies. Defendant then moved for reconsideration [Docket No. 90]. At the hearing on the motion for reconsideration, the Court permitted Defendant to submit a new motion detailing the evidence supporting its assertion that it never received notice of the dispute from a credit reporting agency. On May 22, 2009, Defendant submitted a second motion for summary judgment [Docket No. 150], which Plaintiff opposed [Docket No. 162]. It is this second motion for summary judgment which is considered here.

## III. *DISCUSSION*

### A. Summary Judgment Standard

Summary judgment is appropriate when " 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36–37 (1st Cir.1995) (quoting Fed. R.Civ.P. 56(c)). "To succeed [in a motion for summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.1990); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.' " *Barbour*, 63 F.3d at 37 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.' " *Rogers*, 902 F.2d at 143 (quoting *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations and footnote in *Anderson* omitted)). The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour*, 63 F.3d at 36. The Court, however, " 'must disregard improbable or overly attenuated inferences, unsupported conclusions, and rank speculation.' " *Thompson v. Coca–Cola Co.*, 522 F.3d 168, 175 (1st Cir.2008) (quoting *Abbott v. Bragdon*, 107 F.3d 934, 938 (1st Cir.1997), *vacated on other grounds*, 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998)). "To defeat a motion for summary judgment, the evidence offered by the adverse party cannot be 'merely colorable' or speculative." *Thompson*, 522 F.3d at 175 (quoting *Pagano v. Frank*, 983 F.2d 343, 347 (1st Cir.1993)).

### B. Fair Credit Reporting Act ("FCRA")

"The FCRA is intended to protect consumers against the compilation and dissemination of *inaccurate* credit information." *Deandrade v. Trans Union, LLC*, 523 F.3d 61, 67 (1st Cir.2008) (emphasis in original); *see* 15 U.S.C. § 1681(a)(1) ("Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine ... public confidence.... ").

As the statutory framework governing consumer credit reporting, the FCRA places distinct obligations on three types of entities: (1) consumer credit reporting agencies ("CRAs"); (2) users of consumer reports; and (3) furnishers of information to consumer reporting agencies. *Vazquez–Garcia v. Trans Union de P.R.*, 222 F.Supp.2d 150, 153–54 (D.P.R. 2002); *Aklagi v. NationsCredit Fin. Servs. Corp.*, 196 F.Supp.2d 1186, 1192 (D.Kan. 2002). The term "furnisher of information" is not defined in the FCRA, but "case law has defined it as an entity which transmits information concerning a particular debt owed by a particular consumer to consumer reporting agencies such as Experian, Equifax, … and Trans Union." *Vazquez–Garcia*, 222 F.Supp.2d at 154 n. 5 (internal quotation marks omitted). Here, the parties appear to agree that Defendant is properly considered a "furnisher of information" under the FCRA.

Aiming "to insure that furnishers of information to consumer reporting agencies cooperate in maximizing the goal of the [FCRA] that only accurate and complete information is included in credit reports," Congress amended the FCRA in 1996 to impose two new duties on furnishers. *Id.* at 154 (internal quotation marks omitted). *See generally* S.Rep. No. 108–166, 108th Cong., 1st Sess. 5 (2003) (stating that, when entities choose to furnish information to consumer reporting agencies, "the FCRA imposes duties on them with respect to the accuracy of the information they supply and to investigate consumer disputes").

Section 1681s–2 of the FCRA imposes two types of duties on furnishers of credit information. First, codified at 15 U.S.C. § 1681s–2(a), a furnisher is obliged to ensure that the information it provides to consumer reporting agencies is accurate. Second, codified at 15 U.S.C. § 1681s–2(b), when a furnisher receives notice of a dispute as to the completeness or accuracy of any information provided to a consumer reporting agency, the furnisher is required to conduct an investigation, report the results of the information to the consumer reporting agencies, and, if any inaccuracies are identified, modify, delete, or block the reporting of that erroneous information. *See* 15 U.S.C. § 1681s–2(b). It is this obligation of investigation after notice of a complaint which Mr. Chiang alleges Defendant failed to satisfy.

Significantly, subsection (b) begins: "After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute … the [furnisher] shall…." 15 U.S.C. § 1681s–2(b)(1). The referenced section, Section 1681i(a)(2), requires a consumer reporting agency to provide a furnisher of credit information with prompt notice of a dispute from any consumer. Accordingly, as both parties acknowledge, courts have "uniformly" concluded that Section 1681s–2(b) "provides a private cause of action only if the furnisher received notice from a consumer reporting agency, as opposed to the plaintiff alone, that the credit information was disputed." *Gibbs v. SLM Corp.*, 336 F.Supp.2d 1, 11–12 (D.Mass.2004) (quoting *Aklagi*, 196 F.Supp.2d at 1193); *accord Tilley v. Global Payments, Inc.*, 603 F.Supp.2d 1314, 1322 (D.Kan.2009); *Vazquez–Garcia*, 222 F.Supp.2d at 158.

Defendant insists that it did not receive this requisite notice and that, as a result, Mr. Chiang's claim must fail as a matter of law; Mr. Chiang, however, contends that he has raised a triable issue of fact on the question. Thus, the key question here is whether, drawing all reasonable inferences in favor of Mr. Chiang, there is sufficient evidence to support a finding that Defendant actually received notice of Mr. Chiang's dispute from a credit reporting agency.

In discovery involving the three credit reporting agencies, the parties generally focused on the time period of July 1, 2006 through March 31, 2007. Though it is not clear when, if ever, Mr. Chiang's account was actually reported delinquent, Mr. Chiang claims that he discovered this alleged error and reported it to the credit reporting agencies in the fall of 2006. Thus the time period of July 2006–March 2007 is more than sufficient to capture any relevant communications between the CRAs and Defendant regarding Mr. Chiang's account.[5]

Defendant offers the sworn testimony of representatives from the three major CRAs in the industry: TransUnion LLC ("TransUnion"), Experian Information Systems, Inc. ("Experian"), and Equifax Information Services, Inc. ("Equifax"). Each of the three representatives testified that, based on her review of agency records, her respective agency did not send any notification regarding the dispute to either MBNA, Bank of America, or FIA during the relevant time period. (See Little [TransUnion] Dep. 36:7–10, May 5, 2009; Blair [Experian] Dep. 17:17–18:16, May 5, 2009; Sapere [Equifax] Dep. 16:22–17:24, 70:12–25, May 8, 2009) (Shlesinger Aff. Exs. A–C [Docket No. 158].) Defendant also offers the affidavit of Randolph Geiser, an Assistant Vice President and an Operations Manager for Credit Bureau Disputes with FIA. (Geiser Aff. [Docket No. 154].) Mr. Geiser states that he re-

viewed all of the records for the Account from its inception through 2008, and that the records "confirm [ ] that [neither] FIA, MBNA, nor Bank of America received any notification of a dispute from any credit reporting agency for [the] Account prior to March 16, 2007." (Geiser Aff. ¶¶ 3, 5.)

In response, Mr. Chiang first argues that the testimony of the CRA representatives does not adequately address the fact that, due to the organizational changes occurring at the time, notice of the dispute could have gone to *either* Bank of America, MBNA, or FIA. Mr. Chiang first raised this concern in his opposition to Defendant's motion for reconsideration of the Court's initial denial of summary judgment. In that motion, the affidavits of each CRA representative stated only that the agency had "never sent or transmitted any ... dispute notification to FIA Card Services, Inc.". (See Pl.'s Opp'n to Def.'s Mot. for Reconsideration [Docket No. 91] at 1.) Plaintiff argued, and this Court agreed, that because these affidavits left unanswered the question of whether the CRA had notified either MBNA or Bank of America during the relevant time period, summary judgment was inappropriate at that time.

However, as requested by this Court, Defendant has since submitted a second motion for summary judgment, complete with excerpts of the deposition testimony and new affidavits.[6] The deposition testi-

---

5. In fact, the inquiry captured some additional, unrelated communications. On March 16, 2007, Defendant received a notice from Equifax of a dispute asserted by Mr. Chiang. (See Sapere [Equifax] Dep. 17:15–19, May 8, 2009) (stating that Equifax sent a notification to Defendant regarding a dispute by Mr. Chiang on March 16, 2007); (Def.'s Concise Statement of Undisputed Material Facts [Docket No. 152] ¶ 9.) Both parties agree, however, that the March 16, 2007 notice concerned a separate dispute which is not the basis for Mr.

Chiang's claim in this matter. (See Def.'s Concise Statement of Undisputed Material Facts ¶ 9; Pl.'s Resp. to Def.'s Statement of Facts [Docket No. 164] ¶ 9.)

6. Plaintiff has moved to strike the affidavits of the three witnesses from the credit reporting agency submitted with Defendant's second motion for summary judgment on the grounds that Defendant should not be allowed to use new affidavits to "modify, alter, improve, clarify, or summarize" deposition testimony. (See Pl.'s Mot. to Strike New Affs. of

mony addresses the Court's earlier concern that the agencies may have failed to search for dispute letters addressed to either Bank of America or MBNA (as opposed to FIA). Each agency witness testified that her review of the records included a search for documents addressed to any one of the three entities:

(1) TransUnion's representative stated that she had reviewed the records to determine whether or not the agency sent verification forms to FIA, MBNA, and also Bank of America. (Little (TransUnion) Dep. 36:7–10);

(2) Experian's representative stated that, pursuant to the subpoena for the deposition, she reviewed Experian's records for "any and all dispute notifications Experian transmitted to FIA Card Services, N.A., MBNA America, Inc., N.A., or Bank of America with respect to Wen Y. Chiang's account ending in 9211 during the period July 1, 2006, through March 31, 2007," that she "could not locate any documents, could not find anything," and that had some type of dispute notification been transmitted, it would have been reflected in the logs she reviewed. (Carla Blair (Experian) Dep. 17:17–18:16); and

(3) Equifax's representative stated that, prior to March 16, 2007, when a notification was sent regarding a different dispute, Equifax had not given notice to MBNA, Bank of America, or FIA Card services with respect to a dispute raised by Mr. Chiang regarding the Account. (Sapere (Equifax) Dep. 17:15–24).

Moreover, the affidavit of Mr. Geiser, the FIA Vice President, also accounts for the possibility that notices may have been sent to FIA's organizational predecessors. (*See* Geiser Aff. ¶ 4) (stating that the records he reviewed included "documents that were generated when the Account was maintained by MBNA before the Bank of America acquisition and renaming to FIA" and that the "records would have contained all of the documents relating to the Account, irrespective of whether the documents were addressed to FIA, MBNA, or Bank of America").

Plaintiff contends that he has submitted evidence that contradicts this testimony and establishes that MBNA, FIA, or Bank of America did receive notice from a CRA. Mr. Chiang relies on three groups of communications: (1) letters from Mr. Chiang to CRAs in the fall of 2006; (2) communications between Mr. Chiang and a Bank of America employee on November 29, 2006; and (3) a March 6, 2007 letter from Equifax to Mr. Chiang.

### 1. *Letters from Plaintiff to CRAs, October—December 2006*

Mr. Chiang submitted copies of multiple letters which he claims to have sent to the credit reporting agencies in the fall of 2006. (*See* Carnahan Aff. [Docket No. 165], Exs. A, B, D.)

Mr. Chiang submitted two letters addressed to Experian. In the first letter, dated October 28, 2006, Mr. Chiang asserts that he never received the credit report which he had requested on September 19, 2006. (Carnahan Aff., Ex. C.) The letter states that he had requested the report upon learning that his account with MBNA had been reported delinquent. In the second letter, dated November 30, 2006, Mr. Chiang acknowledges receipt of a credit report and states that he had asked Experian to make an "initial investigation for the negative report" on his

Carla Blair, Eileen Little, and Tina Sapere [Docket No. 167].) This Court denies the

Plaintiff's motion to strike the affidavits, as the affidavits clarify the record.

MBNA and Verizon accounts.[7] (*Id.*)

Mr. Chiang also produced three letters he wrote to Equifax. First is a letter dated October 28, 2006. Mr. Chiang writes that he received a credit alert informing him that his MBNA credit line was reporting as closed and delinquent, disputes that status (and other negative information involving accounts with Verizon), and requests that Equifax investigate the matter. (Carnahan Aff., Ex. D.) In the second letter, dated November 28, 2006, Mr. Chiang references previous letters he had sent to Equifax dated October 28, 2006 and November 24, 2006, both allegedly seeking an investigation into Mr. Chiang's credit report. Third, Mr. Chiang includes a letter dated March 5, 2007 in which he states that, despite previous requests, he has not received notice of a "complete investigation" from Equifax and threatens legal action if they do not correct the report. (*Id.*)

Finally, Mr. Chiang submitted two letters he purportedly wrote to TransUnion. The first, dated November 30, 2006, is nearly identical to the letter of the same date to Experian. (Carnahan Aff., Ex. A.) The second, dated December 4, 2006, also references the dispute regarding his MBNA account and demands that TransUnion investigate the dispute and update him as to any corrections to his account.[8] (*Id.*)

### 2. *Communication between Plaintiff and Bank of America*

Plaintiff relies heavily on a fax sent to him from Bank of America on November 29, 2006 which he claims to have received after speaking with a Bank of America customer service representative on the phone. Mr. Chiang apparently called the customer service line and spoke to a customer service representative about his account. Then, according to Mr. Chiang, the representative faxed him a letter and followed up with another phone call.

The fax from Bank of America to Mr. Chiang acknowledges that Mr. Chiang had contacted the bank about the Account. (Pl.'s Resp. To Def.'s [First] Statement of Undisputed Facts, Ex. D [Docket No. 67].) The letter states that the Account is "currently open and up to date." (*Id.*) Plaintiff's focus, however, is not on the typed message from Bank of America, but rather on his own handwritten note at the bottom of the page. Mr. Chiang asserts that he wrote this note following a phone conversation that he had with a Bank of America employee (Ms. Sherry Wyman) the day he received the fax. The note states:

> called 11–29–06 out 4:55 pm.
>
> Ms. Sherry said all collection[9] [sic] has been sent to credit bureau and allow 90–120 days to showing the credit report. [T]his is include all disputed, wrong reports that she has on file. She also told my account is open and not have any past due history too.

(*Id.*)

Whereas Mr. Chiang suggests that he and the customer service representative spoke on two occasions, the representative's declaration mentions only the conversation initiated by Mr. Chiang's call (and the records submitted by her reflect only one call).

---

**7.** In the November 30, 2006 letter, Mr. Chiang also references the fax he had received from Bank of America/MBNA the previous day; the fax is discussed below.

**8.** This letter also mentions the November 29, 2006 fax from Bank of America to Mr. Chiang.

**9.** As discussed at oral argument and reflected in Plaintiff's brief, "collection" likely was intended to mean "correction."

### 3. *Letter from Equifax*

Finally, Plaintiff points to a letter from Equifax to Mr. Chiang dated March 6, 2007. (*See* Sapere [Equifax] Dep. 30:13–25; Pl.'s Resp. To Def.'s [First] Statement of Undisputed Facts, Ex. G [Docket No. 67].) In the letter, Equifax acknowledges that Mr. Chiang had requested that it reinvestigate certain elements of his credit file. (Sapere [Equifax] Dep. 31:1–7.) The letter then states that Equifax had contacted "each source directly" and completed its investigation. (Docket No. 67, Ex. G.) The letter lists the Account as one of the specific items investigated and states that the results of the investigation indicate that the Account is "reporting as OPEN and not a collection account." (*Id.*)

### 4. *Assessing the Evidence*

■ When all facts are viewed in the light most favorable to the non-moving party, Mr. Chiang, it is reasonable to infer that each CRA received at least one letter from Mr. Chiang complaining of what he deemed an erroneous delinquency status on his MBNA account.[10] However, evidence that the CRAs received a complaint from Mr. Chiang is, on its own, insufficient to defeat summary judgment. Rather, Mr. Chiang must also offer some admissible evidence tending to prove that the CRA actually communicated his complaint to the Defendant; without evidence of this "critical link," Plaintiff's claim fails as a matter of law. *Aklagi*, 196 F.Supp.2d at 1193; *see Young v. Equifax Credit Info. Servs., Inc.*, 294 F.3d 631, 640 (5th Cir. 2002) (concluding that plaintiff's FCRA claim fails as a matter of law because the plaintiff "points to no evidence tending to prove that [defendant] received notice of a dispute from a [CRA]. . . .").

That CRAs are obligated under the FCRA to inform a furnisher of a dispute brought to their attention by a consumer, *see* 15 U.S.C. § 1681i(a), is not an adequate substitute for proof that the CRA actually transmitted the dispute to the furnisher. *See Davis v. Md. Bank*, No. 00–04191, 2002 WL 32713429, *16 (N.D.Cal. June 19, 2002) (rejecting plaintiff's argument that the CRA's statutory obligation to inform a furnisher of a consumer complaint warrants a presumption of notice and granting summary judgment to defendant).

In their deposition testimony, two CRA representatives explained that the receipt of a consumer dispute does not automatically trigger notification to the furnisher. (*See* Little [TransUnion] Dep. 11:14–13:25; Sapere [Equifax] Dep. 10:11–13–9.) Rather, a consumer complaint initiates a multi-step process which may or may not result in contact with a particular furnisher. For example, upon receipt of a consumer complaint letter, the credit reporting agency will perform an initial review to specifically identify the dispute; if the consumer's initial complaint is difficult to decipher, the agency will often contact the consumer asking for additional information before proceeding further. An agency will often first check its records to ensure that the consumer's understanding of their account is accurate (i.e., whether an account which the consumer claims has been reported delinquent is indeed reporting as delinquent). If the consumer's belief does not match what the agency sees on its review of the consumer's file, then the agency may seek to resolve the discrepancy on its own without contacting a furnisher (i.e., the agency may contact the consumer to let him or her know that their account is not listed as delinquent). If, however, the agency determines that the consumer has articulated a specific dispute, then the

---

**10.** This inference is supported by the fact that each of the November letters (three letters in total, each addressed to a different CRA) was accompanied by a certified mail receipt.

agency will inform the creditor of the consumer's complaint.

On cross-examination, Plaintiff's counsel provided Ms. Sapere of Equifax and Ms. Little of TransUnion with copies of the letters from Mr. Chiang to the agencies. Ms. Sapere acknowledged that the October 28, 2006 letter from Mr. Chiang, if received by Equifax, would have been considered a consumer dispute. However, when asked whether the October letter would have generated a notification to the furnisher of Mr. Chiang's account, Ms. Sapere testified that it would depend on whether the account actually showed as closed or delinquent at the time Equifax received the letter. If it was not showing as closed or delinquent, Ms. Sapere stated that there "is potential that [Equifax] might not have contacted the creditor"; instead, the agency might just have "inform[ed] the consumer that it is in good standing." (Sapere Dep. 24:18–24–25:4.) When asked whether the November letter from Mr. Chiang to Equifax would, if received, likely have generated a notice to the furnisher, Ms. Sapere stated that it was "hard to say" whether a notification would have been sent because she was "confused as to exactly what was being disputed." (Sapere Dep. 27:3–11.)

TransUnion's representative, Ms. Little, was presented with two letters from Mr. Chiang to TransUnion, one dated November 30, 2006 and one dated December 4, 2006. (Carnahan Aff., Ex. A.) As to both letters, Ms. Little stated that, if TransUnion received the letter, and it was verified that Mr. Chiang's MBNA account was in fact reporting as delinquent, then TransUnion would have sent notice to the creditor. (Little Dep. 36:19–38:16.) Later in her testimony, however, Ms. Little reviewed a letter from TransUnion to Mr. Chiang dated December 6, 2006; the letter advised Mr. Chiang that TransUnion was unable to determine the nature of the complaint he had raised in a recent letter. (Little Dep. 51:22–52:3.) While this letter from TransUnion contradicts Ms. Little's assertion that the agency never received a dispute from Mr. Chiang, it nevertheless provides support for Defendant's more significant assertion that TransUnion did not contact Defendant regarding Mr. Chiang's complaints. Thus, the letters sent by Mr. Chiang to the CRAs in the fall of 2006 do not constitute a basis upon which a factfinder could reasonably infer that Defendant received the notice required by the FCRA.

Lacking evidence of notification from the CRA's records or Defendant's records, Mr. Chiang turns to his own documentation of communication with Defendant to prove that Defendant received notice from a CRA. Mr. Chiang contends that his note at the bottom of the November 2006 fax from Bank of America—specifically the statements regarding "disputed, wrong reports" on file and corrections being sent to a bureau—constitutes an admission by Defendant that it received a dispute notification from a CRA in November 2006 or earlier. At best, this garbled notation supports an inference that Mr. Chiang informed Defendant of the dispute and Defendant had corrected the problem.

Defendant submitted a declaration from Ms. Wyman, the Bank of America employee with whom Mr. Chiang spoke on November 29, 2006, as well as a copy of Defendant's business record detailing the call. (*See* Decl. of Sherry Wyman [Docket No. 153].) In her declaration, Ms. Wyman states that, though she does not recall the conversation, the record reflects that she received a call from Mr. Chiang on November 29, 2006. (Decl. of Sherry Wyman ¶ 6.) Finally, Ms. Wyman states that she reviewed the history of the Account for the twelve-month period prior to the call from Mr. Chiang, and asserts that the history does not show receipt by MBNA, Bank of

America, or FIA of any notice of dispute from any credit reporting agency. (*Id.* at ¶ 7 (also stating that the history is consistent with the letter faxed to Mr. Chiang advising him that the account was never thirty days past due at any time in the previous 180 day period).) Ms. Wyman states that, given that this is the same history that she would have accessed when speaking with Mr. Chiang on November 29, 2006, she would not have advised Mr. Chiang of anything to the contrary. (*Id.*)

Notably, although it might be reasonable to infer that Mr. Chiang's conversation with the Bank of America employee itself put Defendant on notice of his dispute, even firm proof that a defendant otherwise learned of a consumer's dispute cannot circumvent the statutory requirement that notice be delivered by *a CRA* to a defendant furnisher. *See Whisenant v. First Nat'l Bank & Trust Co.,* 258 F.Supp.2d 1312, 1317 (N.D.Okla.2003) (holding that, even though the defendant "obviously . . . knew" of the dispute, summary judgment for the defendant furnisher was necessary because the facts on the record did not speak to whether a credit reporting agency provided notice of the dispute); *Aklagi,* 196 F.Supp.2d at 1193–1194 (granting summary judgment for defendant who had been notified of dispute by plaintiffs, but not by a CRA); (*see also Gibbs,* 336 F.Supp.2d at 11–12 (stating that courts have consistently concluded that Section 1681s–2(b) only provides a private cause of action if the furnisher received notice from a CRA, as opposed to the plaintiff alone) (quoting *Aklagi,* 196 F.Supp.2d at 1193)).

Finally, Mr. Chiang insists that Equifax's March 6, 2007 letter to Mr. Chiang informing him that, as part of its "reinvestigation," Equifax had contacted "each source directly" undercuts Defendant's as-

sertion that it did not receive a dispute notification from Equifax prior to March 16, 2007 (a notice which all parties agree involves a dispute not at issue in this litigation). Plaintiff makes much of the fact that Equifax used the term "reinvestigation" in its letter. Mr. Chiang insists that this indicates that this was a second investigation, meaning that there must have been an initial investigation which also prompted notice to the Defendant. Maybe so. Nevertheless, while this letter raises a question as to why Defendant's records do not reflect contact from Equifax prior to March 16, 2007, (*see* Geiser Aff. ¶¶ 3, 5), it does not provide a sufficient basis for concluding that a notice was sent to Defendant about the particular dispute at issue here. The letter states that the Account was "reporting as OPEN" and not delinquent, making it unlikely that Equifax would have identified this dispute as requiring formal transmission to the furnisher.

The shortcomings of Plaintiff's evidence are particularly fatal in the face of the sworn testimony from each credit reporting agency stating that it never transmitted a notice of dispute regarding the Account and sworn testimony from the Defendant's Vice President stating that Defendant never received any such notice from a CRA. *Cf. Aklagi,* 196 F.Supp.2d at 1193 (granting summary judgment for the defendant furnisher in case where the only admissible evidence was defense counsel's testimony that the defendant did not receive notice from a CRA); *Redmond v. Bhd. Bank and Trust Co.,* No. 02–2614–CM, 2004 WL 956023, *4 (D.Kan. Jan. 13, 2004) (granting summary judgment for defendant furnisher and stating that "Plaintiff's unsupported denials are insufficient to controvert [the defendant's] assertions" that it never received notice from a CRA.).[11]

---

11. The Plaintiff filed a motion for contempt      against Equifax alleging that it failed to pro-

In sum, Plaintiff has presented sufficient evidence to warrant an inference that he notified at least one CRA and Defendant of what he believed was an erroneous report of delinquency on his account. Yet, despite extensive opportunity for discovery, Plaintiff has failed to produce evidence of the "critical link" of communication between the CRAs and the Defendant. *Aklagi*, 196 F.Supp.2d at 1193. Even though Mr. Chiang was a "squeaky wheel" for both the Defendant and the CRAs, the law here requires that notice to a furnisher be provided by a CRA. This requirement seems harsh because a consumer contending that a furnisher violated its obligations under Section 1681s–2(b) of the FCRA can be precluded from bringing suit against that furnisher if the CRA fails to perform its notification duty. The Court, however, must follow this law.

Accordingly, I conclude that Mr. Chiang's claim that Defendant violated Section 1681s–2(b) of the FCRA fails as a matter of law because Mr. Chiang has not raised a question of material fact as to whether Defendant received notice of the dispute from a consumer reporting agency.

## IV. *ORDER*

Defendant's Second Motion for Summary Judgment [Docket No. 150] is ***ALLOWED***. Plaintiff's Motion to Strike the New Affidavits of Carla Blair, Eileen Little, and Tina Sapere [Docket No. 167] is ***DENIED***.

duce all of its records as ordered by this Court. (*See* Docket No. 168.) However, on July 9, 2009, the Court denied the motion because Plaintiff never certified that he served the motion on Equifax, a non-party.