# United States Court of Appeals

## For the First Circuit

No. 09-2323

WEN Y. CHIANG,

Plaintiff, Appellant,

v.

MBNA, A Bank of America Company;
FIA CARD SERVICES, N.A.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Torruella, Lipez and Howard,
Circuit Judges.

Dean Carnahan, with whom Law Offices of Dean Carnahan was on brief, for appellant.
Terry B. Bates, with whom Reed Smith LLP, Bruce D. Berns and Abendroth Berns & Warner LLC, were on brief, for appellees.

September 9, 2010

**HOWARD**, **Circuit Judge**.  The Fair Credit Reporting Act imposes certain obligations on entities that furnish credit information to consumer credit reporting agencies (CRAs).  See 15 U.S.C. § 1681s-2.  One such obligation is to investigate any disputes over the completeness or accuracy of the information furnished and then notify the CRA of any corrections -- but only if the CRA, acting as a gatekeeper, has previously notified the furnisher of the consumer's dispute.  Id.  § 1681s-2(b)(1).  By contrast, "[a] notice of disputed information provided directly by the consumer to a furnisher does not trigger a furnisher's duties under § 1681s-2(b)."  Chiang v. Verizon New England, Inc., 595 F.3d 26, 35 n.8 (1st Cir. 2010).

The appeal before us centers on this distinction. Plaintiff Wen Chiang brought suit against FIA Card Services, N.A. (formerly known as MBNA America Bank, N.A.), after it allegedly reported delinquent payments on his credit card.[1]  Chiang disputes the alleged delinquency report and claims that FIA, as a furnisher of credit information, violated § 1681s-2(b)(1) by failing to follow up on that dispute with a further investigation.  The district court granted summary judgment to FIA after finding no evidence that a CRA, rather than just Chiang himself, had ever contacted FIA concerning Chiang's objections.  Chiang v. MBNA, 634

---

[1]It is not clear from the record whether Chiang's account was ever actually reported as delinquent.

F. Supp. 2d 164 (D. Mass. 2009).  Discerning exactly the same fatal hole in Chiang's case as the district court found, we affirm.[2]

Because the district court resolved the case on summary judgment, we review its decision de novo.  Harrington v. City of Nashua, 610 F.3d 24, 27 (1st Cir. 2010).  We will affirm the entry of summary judgment if, after we have drawn all reasonable inferences in the non-moving party's favor, the record reveals no genuine issue of material fact that would prevent judgment for the moving party as a matter of law.  Fed. R. Civ. P. 56(c)(2).

Deposed representatives from the three major CRAs testified that they had never sent a dispute notification to FIA.  Consistent with that testimony, an FIA vice president stated in an affidavit that FIA had never received one.  "Once the moving party avers an absence of evidence to support the non-moving party's case, the non-moving party must offer definite, competent evidence to rebut the motion."  Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009) (internal quotation marks omitted).  The evidence Chiang offers, however, is a parade of irrelevancies.

He first seeks to discredit the CRAs' deposition testimony.  He argues that the agencies did not adequately account

_____

[2]This is not the first unsuccessful consumer challenge that this plaintiff and his counsel have brought within this circuit. See Chiang v. Verizon New England, Inc., 595 F.3d 26; Chiang v. Bank of Am., No. 07-cv-11733-RWZ (D. Mass. Mar. 12, 2010); see also Chiang v. Chase Bank USA, N.A., No. 07-cv-11931-NG (D. Mass. June 12, 2008) (dismissal of claims and counterclaims after alternative dispute resolution settlement).

for the fact that, during the relevant time frame, FIA and its institutional predecessors MBNA and Bank of America were in the midst of organizational changes that could have created confusion about which entity actually provided the account. As proof, he points to portions of the testimony where the CRA representatives appeared unfamiliar with the exact relationship between Bank of America, MBNA, and FIA. According to Chiang, a dispute notification could therefore have been sent to any of the three, while the agencies searched their records only for notifications sent to FIA. Yet the agencies explained in their affidavits that searches were conducted according to the consumer's account number, not according to the recipient.[3] Any search would therefore have turned up documents addressed to any of the three entities. Moreover, FIA's affidavit explicitly confirmed that the "records would have contained all of the documents relating to the Account, irrespective of whether the documents were addressed to FIA, MBNA, or Bank of America."

---

[3]The district court allowed FIA to supplement the record with these affidavits after depositions had already been taken. Because the CRA representatives had referred only to FIA in their sworn testimony, the court requested additional discovery to clarify whether the representatives had also searched for notice sent to FIA's affiliates MBNA and Bank of America. Chiang claims that the court erred in considering these supplementary affidavits, but he is mistaken. "A subsequent affidavit that merely explains, or amplifies upon, opaque testimony given in a previous deposition is entitled to consideration in opposition to a motion for summary judgment." Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 26 (1st Cir. 2002).

Chiang generates much sound and fury arguing that these affidavits conflict with the CRA representatives' deposition testimony, creating a triable issue of material fact. But all that the purportedly contradictory testimony shows is that the deponents were not as thoroughly knowledgeable about the relationship between Bank of America, MBNA, and FIA as perhaps they ideally might be. Even construing that fact in Chiang's favor, it would have nothing to do with whether a search according to account number would turn up documents sent to any of them. The result would have been the same whether the agencies' representatives thought that the three entities were affiliates or unrelated competitors. There was no notice in any of the agencies' records, and the account number-based search would have found any that existed. The only reasonable inference is that no notice was ever sent.

Chiang's own documentary evidence is similarly beside the point. He points to complaints that he sent to CRAs, but these do not establish that the agencies ever took the next step of communicating those complaints to the furnisher. As the district court aptly explained,

> In their deposition testimony, two CRA representatives explained that the receipt of a consumer dispute does not automatically trigger notification to the furnisher. Rather, a consumer complaint initiates a multi-step process which may or may not result in contact with a particular furnisher. For example, upon receipt of a consumer complaint letter, the credit reporting agency will perform an initial review to specifically

-5-

identify the dispute; if the consumer's initial complaint is difficult to decipher, the agency will often contact the consumer asking for additional information before proceeding further. An agency will often first check its records to ensure that the consumer's understanding of their account is accurate (i.e., whether an account which the consumer claims has been reported delinquent is indeed reporting as delinquent). If the consumer's belief does not match what the agency sees on its review of the consumer's file, then the agency may seek to resolve the discrepancy on its own without contacting a furnisher (i.e., the agency may contact the consumer to let him or her know that their account is not listed as delinquent).

Chiang, 634 F. Supp. 2d at 171 (internal record citations omitted).

He next offers a faxed communication he received from Bank of America regarding his account. This document's significance, according to Chiang, lies not in the typed content of the fax itself but in Chiang's own handwritten note, allegedly jotted down during a phone conversation with a Bank of America customer service representative, Sherry Wyman: "Ms. Sherry said all [corrections][4] has [sic] been sent to credit bureau and allow 90-120 days to showing [sic] the credit report. this is include [sic] all disputed, wrong reports that she has on file. She also told [sic] my account is open and not have any past due history too." Here, too, there is no suggestion that a CRA had contacted FIA concerning the disputed information. Moreover, Wyman stated in

---

[4]Chiang appears to have written a different word here, but he maintains that he meant "corrections." The choice of words does not alter the analysis.

-6-

her affidavit that, at the time of the alleged phone call, she was not working in the credit bureau dispute department and would not have handled a credit bureau dispute from Chiang or anyone else.

Chiang's final piece of evidence is a pair of letters that Equifax, one of the CRAs, sent to him. These letters acknowledge completion of Chiang's requested investigation of his credit file and explain that Equifax had "contacted each source directly." Chiang insists that a reasonable juror could infer from these letters that Equifax had indeed contacted FIA. But even if Equifax had contacted FIA in some capacity, other language in the letters makes it unreasonable to infer that Equifax had sent notice about the particular dispute at issue here. The letters proceed to explain that the credit card account was "reporting as OPEN" and "paid as agreed, with no late payments," rather than delinquent; because the predicate for Chiang's complaint was nowhere to be found, it is rather unlikely that Equifax would have identified the dispute as requiring formal communication to FIA. Indeed, the letters also mention two disputes with Verizon, noting that "[t]his creditor has verified to Equifax that the balance is being reported correctly" -- a sentence conspicuously absent from the paragraph dealing with the FIA account. That Equifax memorialized this verification only when discussing the Verizon disputes and not the FIA dispute suggests that Equifax actually communicated the relevant dispute to Verizon but not to FIA. Hence, by negative

implication, these letters actually cut against the proposition that Chiang believes them to support.[5]

Affirmed. Costs to appellees.

---

[5]Chiang also highlights the letters' use of the word "reinvestigate," which appears to suggest that Equifax had in fact conducted some prior investigation of the dispute. But "reinvestigation" is a term of art in the Fair Credit Reporting Act and refers only to a CRA's reevaluation of a consumer's credit report in light of a consumer's dispute, not a second investigation. See 15 U.S.C. § 1681i(a)(1)(A) ("[I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly, or indirectly through a reseller, of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate . . . .").